# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF MASSACHUSETTS

## EASTERN DIVISION

| | |
|---|---|
| In re<br><br>**JEFFREY ROSS ACKERMAN,**<br><br>    **Debtor**<br>────────────────────<br>**ELIZABETH W. ACKERMAN TRUST U/A/D 12/18/1967, by and through its Co-Trustees, Lawrence Litvak and Timothy R. J. Mehrtens,**<br><br>    **Plaintiff**<br>**v.**<br><br>**JEFFREY ROSS ACKERMAN,**<br><br>    **Defendant** | **Chapter 7**<br>**Case No. 11-21878-FJB**<br><br><br><br><br><br>**Adversary Proceeding**<br>**No. 12-1076** |

<u>**MEMORANDUM OF DECISION**</u>

By its complaint in the above-captioned adversary proceeding, the Elizabeth W. Ackerman Trust U/A/D 12/18/1967 ("the Trust"), by and through its co-trustees, Lawrence Litvak and Timothy R.J. Mehrtens, seeks a determination that certain unliquidated and disputed liability of the defendant and chapter 7 debtor, Jeffrey Ross Ackerman ("Jeffrey" or "the Debtor"), a former trustee of the Trust, to the Trust for alleged breaches of his duty as trustee, are excepted from discharge under 11 U.S.C. § 523(a)(2)(A) and (a)(4). After a trial and for the reasons set forth below, the Court now determines that a judgment of nondischargeability is appropriate as to most of the liability at issue.

**PROCEDURAL HISTORY**

On December 23, 2011, the Debtor filed a petition for relief under chapter 7 of the Bankruptcy Code, thereby commencing the bankruptcy case in which this adversary proceeding arises. On October 2, 2012, the Court entered a discharge under 11 U.S.C. § 727 in the Debtor's favor. On March 26, 2012,

the Trust timely filed the complaint commencing this adversary proceeding. By its complaint, the Trust

seeks a determination that its unliquidated claims against the Debtor are excepted from his discharge.

The same complaint also seeks an adjudication of the underlying liability, but by an earlier order, the

Court abstained under 28 U.S.C. § 1334(c)(1) as to the liability counts and accordingly dismissed the

same without prejudice. Only matters of dischargeability remain.

The complaint contains only two counts for determination of nondischargeability. Each count,

however, is based on multiple legal bases. Count I, under § 523(a)(2)(A), contains conclusory allegations

of false pretenses, false representations, and actual fraud, three distinct bases within subsection

(a)(2)(A); and Count II, under § 523(a)(4), contains conclusory allegations of fraud while acting in a

fiduciary capacity, defalcation while acting in a fiduciary capacity, embezzlement, and larceny, four

distinct bases within subsection (a)(4).  The Trust seeks a determination that the exceptions to discharge

for embezzlement and for defalcation while acting in a fiduciary capacity apply to each of eleven distinct

and specified factual bases of liability.

The parties submitted a joint pretrial memorandum, including an extensive stipulation of facts.

The joint pretrial memorandum did not narrow or further define the counts being tried. The matter was

tried over five days, during which the parties presented the testimony of six witnesses: Matthew Weiss,

Timothy R. J. Mehrtens, Elizabeth Werner, Flora Cordel, Edward Alexander Pollack, and the Debtor. After

trial, each party submitted proposed findings of fact and conclusions of law, and the Trust also

submitted a post-trial memorandum.

**FINDINGS OF FACT**[1]

    **A. Background and Establishment of the Trust**

1.    Elizabeth W. Ackerman, born and now known as Elizabeth Werner ("Elizabeth"), is the beneficiary of the Plaintiff Trust, the Elizabeth W. Ackerman Trust U/A/D 12/18/1967. (Stipulation of Facts, ¶ 1)  Born in December 1946, she is the daughter of Leo Werner, an entrepreneur who amassed a fortune through the family ladder business, and Anne Werner.  Elizabeth's parents established the Trust for her, but she is nonetheless referred to throughout the establishing Agreement of Trust ("Agreement of Trust") as "the Settlor."  The Agreement of Trust is an agreement between Elizabeth as "Settlor" and the Trust's original trustee.  The Trust was funded at its inception and until 1998 with stock in the family business, on account of which the Trust received quarterly dividend distributions. In addition, Elizabeth is also the beneficiary of the Anne Werner Trust (the "Anne Werner Trust").

2.    Elizabeth has been married and divorced twice and has two children, one from each marriage. (Stipulation of Facts, ¶ 2)  Her first marriage was to Mickey Ackerman, whom she married in 1967 and divorced in 1976.  Her second marriage was to Allan Weiss, whom she married in 1979 and divorced in 1993.

3.    Jeffrey is Elizabeth's older son, from her first marriage. (Stipulation of Facts, ¶ 3) Matthew Weiss ("Matt") is Elizabeth's younger son, from her second marriage. (Stipulation of Facts, ¶ 4)

4.    Article I.A. of the Agreement of Trust provides that the Trustee shall pay the net income of the trust estate to Elizabeth in quarterly installments during her lifetime, and upon certain conditions pay for tax on any capital gains. (Stipulation of Facts, ¶ 5)

5.    Article 1.B of the Agreement of Trust provides that:  "If, in the opinion of the Trustee, the Settlor shall at any time, for any reason whatsoever, be incapable of properly using the income to

---

[1] Facts to which the parties have stipulated are identified by citations to the stipulation of facts contained in the parties' joint pretrial memorandum. All other facts are the findings of the court.

which she may be entitled, the Trustee may, during the period of such incapacity, apply so much of the income as may, in the Trustee's opinion, be required for the proper and comfortable maintenance, support, education and well-being of the Settlor, her spouse and children, either by the payment of bills therefore, or by the payment thereof to such person or persons, including the Settlor, or institutions as the Trustee may select[.]"

6.      Article I.C. of the Agreement of Trust provides that: "In addition, during the lifetime of the Settlor, the Trustee is authorized to pay and distribute to the Settlor, or for her benefit or to or for the benefit of the Settlor's spouse, and/or children, so much of the principal of the Trust as the Trustee, in its discretion deems advisable for the maintenance, support, medical and surgical care of the Settlor, her spouse and children, and for the complete education of the Settlor and her children. In the exercise of this power the Trustee may consider the other income and sources of support of the Settlor and the Settlor's spouse and children known to the Trustee." (Stipulation of Facts, ¶ 6)

7.      Article I.D. of the Agreement of Trust provides that, notwithstanding the provisions of Articles I.B and Article I.C., "the Trustee shall not, during [Elizabeth's] lifetime, make any distributions of income or principal to or for the benefit of any person other than [Elizabeth] unless [Elizabeth] shall have authorized the same by written authorization filed with the Trustee." (Stipulation of Facts, ¶ 7)

8.      Article I.F. of the Agreement of Trust provides that, upon Elizabeth's death, the Trustee is to distribute the principal and any accumulated and undistributed income remaining on hand as she directs in her Last Will and Testament, or in default thereof, in equal shares to her children per stirpes. (Stipulation of Facts, ¶ 8)

9.      Article III of the Agreement of Trust, entitled Powers of the Trustee, states: "The Trustee and any successors shall have the following powers, authority and discretion, with respect to any property, real or personal[.]" The enumerated powers include the powers (i) to "invest and reinvest in stocks (whether common or preferred), bonds, securities, undivided interests in any real and personal

property, . . . and any property, real or personal"; (ii) "to sell or exchange real or personal property at

public or private sale, for cash or upon credit, with or without security, upon any terms"; and (iii) [t]o

hold property in the individual name of the fiduciary or in the name of a nominee or nominees, without

disclosure of the trust[.]"

10.     Article IV of the Agreement of Trust states: "This Trust shall be irrevocable, and the

Settlor shall nave no power to alter, modify or amend this Agreement."

11.     Article V.B of the Agreement of Trust states: "This Agreement shall be construed,

regulated and administered in all respects in accordance with the laws of the Commonwealth of

Pennsylvania."

12.     From the Trust's creation in 1967 until March 1998, the trustee of the Trust was First

Seneca Bank and Trust Company ("First Seneca") of Mercer County, Pennsylvania.

13.     Jeffrey was born in 1967.  He lived with his mother and father until their divorce, then

with his mother afterward, including after her remarriage and the birth of Matt, until he left home for

college.  Matt was approximately 5 years old at that time.  Jeffrey attended Boston College as an

undergraduate, worked at Procter & Gamble, then studied business at the Kellogg School at

Northwestern University and received his graduate degree in 1996.  After completion of his schooling,

he worked for Andersen Consulting in San Francisco until the summer of 1998, then moved to the east

coast where he joined a boutique private equity firm, Orion Partners.

14.     For most if not all of her adult life, Elizabeth has suffered from alcohol and substance

abuse issues. These have affected her health, her judgment, her memory, her behavior, her marriages,

her relationships with Jeffrey and Matt (albeit in different ways), and her financial affairs. On account of

this abuse, she has had lengthy stays at rehabilitation facilities on at least six different occasions. The

substance abuse has led her at times, while she was abusing, to lie to friends and others—that's part of

the addiction, she and her sons agree.  While she was abusing, she was known to consort with other

addicts and, in the words of one counselor, "with felons, perpetrators, and mooches," and she went through spells when she had strangers living with her. The abuse was a factor in the disintegration of both of her marriages and in her loss of custody of Matt to Allan Weiss.  The loss of custody, and the substance abuse that in general led to it, caused her relationship with Matt to be for a long time more distant and strained than her relationship with Jeffrey.  Elizabeth and both of her sons all agree that the abuse also affected her memory, though precisely how is not clear.

15.    In 1992, Elizabeth retained the Colorado law firm now known as Litvak, Litvak, Mehrtens & Carlton, P.C., at which Timothy Mehrtens ("Mehrtens") (now a co-trustee of the Trust) was then an associate, to represent her in conjunction with the dissolution of her marriage to Allan Weiss and the attendant custody issue.  It was during this representation that Mehrtens first came to know Elizabeth.

16.    Anne Werner passed away on April 5, 1996. For reasons having to do with substance abuse, Elizabeth did not attend her mother's funeral.  Leo, upset about Elizabeth's nonattendance, rewrote his estate plan to redirect his fortune, valued at the time of his death at $68 million, away from Elizabeth and her sons to some 30 or 40 cousins. Leo passed away later the same year, on August 10, 1996, and Elizabeth and her sons apparently received nothing—aside, that is, from the considerable assets of which Elizabeth was already beneficiary under the Trust and the Anne Werner Trust.

17.    Later in 1996, Elizabeth, having trouble with alcohol and with managing her affairs, went with Jeffrey back to Mehrtens, who had by then become a partner in his firm, to discuss what could be done.  They agreed the best way to address it was for Elizabeth to give Jeffrey a durable power of attorney over her affairs. Mehrtens drafted the instrument.

18.    Elizabeth granted Jeffrey a power of attorney to manage her financial affairs, under an instrument dated August 27, 1996 (the "Power of Attorney"). (Stipulation of Facts, ¶ 11)  The instrument, a durable power of attorney, was executed in Colorado, where Elizabeth then resided (and still to this day resides). It included the following provisions:

a.      "This Power of Attorney shall not be affected by my incapacity or disability."

b.      "Powers of Attorney-in-Fact:  My attorney-in-fact shall have full power and authority to do and perform all and every act and thing whatsoever requisite and necessary to be done in and about the premises, as fully to all intents and purposes as I might or could do if personally present, with full power of substitution and revocation, hereby ratifying and confirming all that my Attorney-in-Fact shall lawfully do or cause to be done by virtue hereof, including managing my financial affairs to the same extent as I might do myself, including without limitation all powers conferred on fiduciaries by law[.]"

c.      "Obligations and Rights of Attorney-in-Fact:  My attorney-in-fact shall exercise all powers in good faith and with my attorney-in-fact's best judgment as to how I would manage my affairs.  My attorney-in-fact will not be liable for any good faith judgment but only for intentional wrongdoing or gross negligence."

d.      "Distributions:  My attorney-in-fact, acting with sole and absolute discretion, shall distribute from time to time such of the income or principal, or both, of my assets to or for the benefit of myself and others who I have supported or otherwise identified to my Attorney-in-Fact prior to the date of this Power-of-Attorney, to the same extent as I myself might have done."

e.      "Construction and Effect:  . . . This Power of Attorney shall be constructed pursuant to the laws of Colorado."

19.      The Power of Attorney did not expressly grant the agent, Jeffrey, the authority to make a gift, much less to himself or from the Trust.  Nor did it specifically authorize the agent to exercise Elizabeth's power under the Agreement of Trust to authorize the trustee in the exercise of its powers to make distributions to persons other than Elizabeth.  It did not mention the Trust at all.

20.      Elizabeth granted this power of attorney to Jeffrey because her substance abuse problems made her unable to handle her financial affairs on her own, because Jeffrey was involved in her life and was her principal source of help when she needed help, and because she held Jeffrey in high regard and trusted him. It is undisputed that Elizabeth was competent and sober when she executed the Power of Attorney and understood its effects and import. The immediately precipitating need for the Power of Attorney was to assist Elizabeth with her day-to-day affairs, especially paying her bills; she was going into a rehabilitation facility for a short period of time and needed someone to be able to help manage her affairs.

21.    After receiving the power of attorney, Jeffrey set up what he called a "power of attorney

bank account" ("the POA Account") at Bank of America, an account in which he could hold and

administer Elizabeth's funds. Jeffrey understood that his duty in exercising the power of attorney was

"to step into my mother's shoes and act in her behalf, act in her best interests."  In the two years

following the creation of the power of attorney, Jeffrey worked with Tim Burke, as trustee of the Anne

Werner Trust, and First Seneca as  trustee of the Ackerman Trust, to arrange for (i) Elizabeth's payment

of her medical bills, especially for the treatment facility she had gone to shortly after execution of the

Power of Attorney, (ii) for receiving Elizabeth's quarterly distributions, (iii) for paying money to

Elizabeth, (iv) for advocating for her with the trustees, and (v) for paying her bills on her behalf. Jeffrey

testified that during this time he provided instructions to trustees First Seneca and Tim Burke for Liz

under his power of attorney.  He did not elaborate on the nature and necessity of these instructions.

22.    Following the death of Leo Werner, Leo's transfer of his fortune away from Elizabeth

and her sons to other relatives became a sore spot in the family.  It led to discussions over the next

eighteen months or so among Elizabeth, Jeffrey, Matt, Mehrtens, Fred George (a trust and estates

attorney in Pittsburgh who had been Leo Werner's estate planning attorney), a litigator from the same

firm as Fred George, and Tim Burke as trustee of the Anne Werner Trust.  These discussions resulted in a

decision in March 1998 to file suit against the transferees of Leo's assets.  They immediately approached

First Seneca, as trustee of the Trust, to let them know that "they"—meaning the discussants, on behalf

of Elizabeth and perhaps also of Jeffrey and Matt—would be filing suit and to request that the Trust

fund their litigation efforts. Within a day, First Seneca responded that it had relationships with many of

the Werner family, preferred not to be involved in the litigation, and consequently had decided to resign

as trustee of the Trust.

23.    During the same eighteen months, there occurred numerous discussions among Jeffrey,

Fred George, Frank Seffinger (a Denver-based accountant and tax adviser to Elizabeth), and Tim

Mehrtens about a number of things relative to the Trust: filing the lawsuit; Elizabeth and her condition;

dealing with tax issues; potentially dissolving the Trust (a 1976 document, it didn't have much

sophisticated estate planning in it) and perhaps distributing it to Matt and Jeffrey and having another

trust created for Elizabeth; keeping the Trust's assets and affairs away from Allan Weiss, whom they

distrusted; and keeping information about the Trust away from Matt, so that Allan could not get that

information through Matt. They discussed dissolving the Trust, in part, because Elizabeth didn't like

having to be in relationship with the employees of a small-town bank in western Pennsylvania—she felt

they didn't really care about or know her—and also because Jeffrey and Elizabeth viewed the Trust as

inflexible and not family-friendly.

24.    Consequently, when First Seneca announced its decision to resign, it was quickly

decided among all the parties to these discussions that having Jeffrey step in the role of trustee was the

best thing.  They decided not to dissolve the Trust, because they were about to embark on major

litigation and didn't want to rock the boat.

25.    First Seneca resigned as trustee in or around March 1998. (Stipulation of Facts, ¶ 9)

Pursuant to Article V.A. of the Agreement of Trust, on or about March 11, 1998, Elizabeth appointed

Jeffrey as trustee of the Trust. (Stipulation of Facts, ¶ 10)

26.    On March 18, 1998, within a week after being appointed as Trustee of the Trust, Jeffrey

attended a meeting with Elizabeth, Mehrtens, Frank Seffinger, the certified public accountant who

prepared tax returns for Liz and later prepared tax returns for the Trust, and Fred George. (Stipulation of

Facts, ¶ 86)  The meeting was held at Mehrtens' office in Denver.  Mehrtens took detailed notes of the

meeting.  The meeting's purpose was to lay the groundwork as to how the Trust would be handled going

forward, what issues should be considered and addressed. Mehrtens' notes indicate that the following

four issues were discussed: (i) that Matt has rights under the trust and could question Jeffrey's actions

as trustee; (ii) whether there existed a conflict of interest between Jeffrey's obligations under the Power

of Attorney and his obligations under the Trust, about which Mehrtens' notes say "Documentation is a

key issue and procedure"; (iii) "Need Liz's written authority to payout to children"; and (iv) "Fred does

not recommend annual reporting to Matthew."

27.     Jeffrey was present at this meeting and heard these concerns expressed.  They were

directed at him and expressed for his instruction. He is an intelligent and astute business person and

would not have been overwhelmed by the discussion.  I consequently find that from the beginning of his

tenure as trustee, he was well aware of the requirement in the Agreement of Trust that Elizabeth's

written authorization was necessary for distributions to her children.  He was aware of and honored

concerns about keeping the affairs and dealings of the Trust from Matt, because of concern about

Matt's father's using that information to somehow reach Trust assets.  He was also well aware that Matt

had contingent rights under the Agreement of Trust, that he (Jeffrey) might someday be called upon by

Matt to answer and account for his actions as trustee, and that documentation and procedure were

important.

28.     When Jeffrey became trustee of the Trust in March 1998, there was approximately

$10.5 million worth of assets in the Trust. (Stipulation of Facts, ¶ 22)  This was the net worth of the

assets; around the time of the change in trusteeship, the Trust liquidated its long-held shares in the

Werner family business, and the $10.5 million figure is net of the capital gains taxes incurred on account

of the sale.  Following his appointment as Trustee, Jeffrey employed Fiduciary Trust Company

International ("FTCI") to act as custodian of the Trust's assets.  (Stipulation of Facts, ¶ 14) FTCI remained

custodian until approximately February 2011. The Trust's main account at FTCI was Account No. ending

in *****0718 (the "Fiduciary Main Account"). (Stipulation of Facts, ¶ 15)  The Trust also had a second

account at FTCI, which held primarily miscellaneous non-publicly traded assets, Account No. ending in

*****0742 (the "Fiduciary Miscellaneous Account"). (Stipulation of Facts, ¶ 16)

29.     Early in his tenure as trustee, Jeffrey also hired a firm known as Capital Guardian to act as the Trust's investment manager, to advise him on the mix of equities and bonds that the Trust should be invested in.  With Capital Guardian's guidance, Jeffrey invested the Trust's funds in a diversified basket of from 60 to 100 different equities and also in some fixed income securities.

30.     Jeffrey became trustee of the Trust, the assets in the Anne Werner Trust totaled approximately $6 million in value.  Jeffrey had no power as to the Anne Werner Trust but was required to consider the extent of its assets, and the benefits Elizabeth was receiving from it, in determining how to administer the Trust.

### B.  Graduate Education

31.     Jeffrey's graduate school education was paid for, at least in part, from Trust assets. There is no evidence as to precisely how Jeffrey's graduate education was financed, or precisely when and to whom payments from the Trust were made on it.  Jeffrey completed his graduate education approximately two years before he became trustee.  Jeffrey acknowledges, however, that Elizabeth gave him written authorization to disburse Trust funds to pay for his graduate education.

### C.  The Abbott Road Property

32.     In or around the year 2000, Jeffrey and his wife, Abigail C. Ackerman ("Abigail"), bought a house on Abbott Road in Wellesley, Massachusetts to serve as their home.  Jeffrey had conversations with Elizabeth about using Trust money to help fund his and Abigail's acquisition and renovation of the property.  As a result of these conversations, Elizabeth authorized in writing the use of $200,000 of Trust monies for these purposes.  Jeffrey and Abigail did in fact use $200,000 of Trust monies for these purposes.

**D.   Nanny's Salary**

33.      Jeffrey and Abigail hired Flora Cordel as a nanny for their children.  She started in late

1999 or 2000 at a salary of $250 per week plus room and board. She continued in their employ until the

middle of 2008, by which time her weekly salary had increased to $500.

34.      Jeffrey does not dispute that he used Trust monies to pay Ms. Cordel's salary.  The

extent of his appropriations for this purpose is not in evidence.

35.      Asked whether he'd had discussions with Elizabeth regarding authorization to use Trust

funds to pay for Ms. Cordel's services, Jeffrey answered:  "Yeah. And so part of that was just my

mother's general support for me at the time. Yeah. And, you know, one of those things is going to be to

– being able to pay for Flora." I find his response indicative that Jeffrey would have the Court find

Elizabeth's authorization in the vaguest of general indications.  Also, he gave no indication of what he

meant by "my mother's general support for me at the time."  He did not indicate the specific words,

date, or aggregate amount of Elizabeth's alleged authorization.  As Jeffrey concedes, he received no

*written* authorization to make payments from the Trust for Ms. Cordel's services.  I find that had he had

her authorization in any form, he likely would have had her reduce it to writing; because he did not, I

find that Elizabeth had not authorized this use of Trust money in any manner.

**E.   Werner Family Litigation**

36.      The litigation that Jeffrey contemplated in early 1998 against those to whom Leo

Werner had redirected his fortune did in fact occur.  No details of the litigation are in evidence, but it is

clear that Jeffrey, as trustee, funded the litigation from the Trust and that Elizabeth authorized this

funding in writing.  The litigation was settled in 2004.

**F.   Purchases in Oak Creek**

37.      From 2000 through 2002 or 2003, Jeffrey and a good friend, David Epstein ("Epstein"),

made a series of real estate investments in Oak Creek, Colorado.  Jeffrey believed the area would soon

grow in population and that real estate values would grow with the population.  Jeffrey and Epstein

made these investments through limited liability companies (LLC) known as Oak Creek Partners I, Oak

Creek Partners II, and Oak Creek Storage Partners (formerly known as Oak Creek Partners III).  The

equity in each of these LLCs was owned in equal parts by Epstein and either Jeffrey or Chair 5 Partners

LLC, another LLC in which Jeffrey had an interest.  (The extent of Jeffrey's interest in Chair 5 Partners LLC

at that time is not in evidence.) The Trust never held equity in any of the Oak Creek LLCs.

38.      Jeffrey used Trust monies totaling $405,000 to fund some of the acquisitions by the Oak

Creek LLCs of their interests in real estate.

39.      Jeffrey's testimony gave the impression that when he first used the Trust's money for

the Oak Creek purchases, the nature of the transactions was not settled even in his own mind: "The

money that came from the Trust into me was a loan *ultimately*." (Emphasis added.)  I find that Jeffrey

himself was unclear on the nature of his appropriation of the Trust's money when he himself

appropriated it for Oak Creek purchases:  whether loan or equity investment, to himself or to Chair 5

Partners LLC.  Jeffrey nonetheless testified that this $405,000 was a loan by the Trust to Chair 5 Partners

LLC, which in turn invested it in the Oak Creek LLCs.  Jeffrey concedes that he generated no promissory

note or other documentation for this loan to Chair 5 Partners LLC.  There is no indication that this loan

had a specified term or carried an obligation to pay interest on the outstanding principal.  Jeffrey did not

indicate how he reasoned that his taking of money without an obligation to repay it at any definite time

was a loan and not simply a taking that he could choose to repay or not. This "loan" appeared on the

FTCI-maintained schedule of the Trust's miscellaneous assets with the simple description "Chair 5

Partners LLC" and no further indication of what kind of asset this might be.  Nor did Jeffrey attempt to

defend this "loan" as in the best interest of the Trust.  With no interest, no documentation, and no term,

the "loan" exposed the Trust to only risk and carried no upside at all, no prospect of a profit.  Any profit

from sale of the Oak Creek properties would inure to the Oak Creek LLCs, not at all to the Trust, which at best stood only to recoup its "principal."

40.      Following disposition by the Oak Creek LLCs of two of the properties they had purchased, the Trust received two payments on account of Jeffrey's use of Trust monies to purchase the Oak Creek properties:  a payment of $60,000 on April 18, 2006, and a payment of $48,000 on August 2, 2006, both from Chair 5 Partners LLC.  The Trust has never received any other payment for this use of its monies.  Jeffrey has offered no explanation as to why, if this transfer of $405,000 from the Trust to Chair 5 Partners LLC was a loan, Chair 5 Partners never repaid the balance of $293,000. Nor has he offered evidence that the transfer of $405,000 was treated by Chair 5 Partners LLC as a liability.

41.      Jeffrey maintains that Elizabeth knew about the Oak Creek properties and that he discussed these investments with her, but there is no evidence of what he told her and when.  He does not contend, and there is no evidence, that she approved of his use of Trust monies for the Oak Creek entities, either in writing or otherwise.

### G.  Pavilion Ranch

42.      In 2001, Jeffrey formed a real estate development LLC known as Pavilion Ranch Partners LLC, which  purchased two adjacent parcels in Steamboat, Colorado, one of which was a 110-acre ranch on a river.  Epstein resided on the ranch property with his family, had managed it for the former owner, and managed the property for the LLC while it remained a ranch.  It was Epstein who brought the ranch property to Jeffrey's attention as a development opportunity.  The purpose of the LLC was to acquire the two adjacent parcels, combine and re-divide them into three parcels, each having river access, and develop each as residential property for resale.  Epstein handled much of the local work that needed to be done to facilitate the formal subdividing and redevelopment of the properties.

43.      According to Jeffrey, he and Matt each had a 37 or 38 percent equity interest in Pavilion Ranch LLC, and the Trust had a 10 percent interest in the LLC.  There is no evidence as to ownership of

the remaining 14-16 percent. No evidence was submitted as to the amounts of the contributions that

the equity holders made for their respective equity interests. Matt at the time was 20 years old and had

no funds at his disposal to invest; he testified that he believed the Trust had funded his investment.

There is no independent evidence to corroborate this or even to establish that any investment had been

made for his or Jeffrey's equity interest.  Had funds been advanced to the LLC by the Trust on Matt's

behalf, the advance would have constituted a distribution from the Trust to Matt; no such distribution

was approved by Elizabeth in writing.

44.     The Trust had a further "interest" in the LLC in the form of a loan that Jeffrey, as trustee,

made from the Trust to the LLC.  Jeffrey testified that he believed the loan was for $1.3 million.  There is

no evidence of the terms of the loan, whether it bore interest or had a specified term.  Jeffrey wasn't

sure whether the loan had been documented by a promissory note but conceded that the loan was not

secured by a mortgage.

45.     The LLC also financed its development efforts with a further loan from a commercial

lender, Alpine Bank, which loan was secured by a mortgage.

46.     The development of Pavilion Ranch took longer than expected, slowed by events of

September 11, 2001 and their effects on real estate markets.  Nonetheless, the LLC did get approval for

its subdivision and then developed and sold each of its three parcels, the last on November 22, 2006.

The proceeds of the first two closings were used to pay off the mortgage to Alpine Bank.

47.     Net proceeds of the third and final closing, totaling $928,568.64, were wired to the

Trust in partial satisfaction of its $1.3 million loan. (Stipulation of Facts, ¶ 29)  This sum did not include a

distribution on account of the Trust's 10 percent equity interest in the LLC.  Jeffrey testified that there

were no residual proceeds to distribute to equity holders.  Jeffrey supplied no accounting of the LLC's

receipts and disbursements.  I have no evidence of any other recovery by the Trust on its loan to the

LLC.

48.      At trial, Mehrtens testified that he believed as of the time of trial "that the Pavilion

Ranch was in fact a permissible investment" by Jeffrey of trust monies.  By this statement I understand

Mehrtens to have withdrawn the Trust's request for a determination that any liability of Jeffrey to the

Trust for its uses of Trust money on the Pavilion Ranch development, including to purchase equity

interests in the LLC for Matt and Jeffrey, is excepted from discharge.

**H.  Use of Trust Money for Franchise Businesses**

49.      In or around 2003, Jeffrey decided to leave his position at Orion Partners and to begin a

business that would open and operate a number of "fast casual" restaurant franchises in the northeast.

The name and type of business entity (or entities) under which this business was organized are unclear;

for the most part, the parties referred to the entity as Chair 5 Partners LLC ("Chair 5 Partners"), but

Jeffrey also mentioned an entity known as Beatus. For ease of reference, and because any distinction

between Chair 5 and Beatus is irrelevant here, I will refer to the business as Chair 5 Partners.

50.      Beginning in 2004, Jeffrey, through Chair 5 Partners, opened and operated a number of

Qdoba restaurant franchises in the Greater Boston area and several chicken restaurant franchises

known as Pollo Campero. (Stipulation of Facts, ¶ 36)

51.      Most of the money that Jeffrey invested in Chair 5 Partners he took from the Trust.  In

all, he appropriated $1.6 million of Trust monies to fund his equity investments in this business.  He

made these investments and the corresponding appropriations of Trust monies between 2003 and 2007.

52.      The Trust acquired no equity in the franchise business.  All the equity the Trust money

purchased was purchased in Jeffrey's name and for Jeffrey.  Jeffrey did not hold his equity for the Trust;

the equity was his own.

53.      Elizabeth did not authorize in writing the use of Trust monies to fund Jeffrey's equity

contributions to Chair 5 Partners.

54.    Jeffrey seeks a finding that Elizabeth nonetheless knew of and authorized this use of

Trust money other than in writing. The preponderance of the evidence is to the contrary. Had Jeffrey

obtained Elizabeth's authorization to use $1.6 million for Chair 5 Partners, he would likely have had her

memorialize that authorization in writing. He did not.  And there is no evidence of the specific words by

which she is alleged to have authorized these appropriations.  For these reasons, the evidence

preponderates in favor of a finding that she did not authorize this use of Trust money by any means.

55.    At its height, Chair 5 Partners opened some 22 or 23 franchises, but the business ran

into trouble in the economic contraction of 2008, trouble from which it did not recover. In 2010, Chair 5

Partners sold the franchises back to their respective franchisors. The terms are not in evidence.

**I.    Letters of Credit for Franchises**

56.    In early 2004, Jeffrey sought to obtain various letters of credit to secure restaurant

leases for Chair 5 Partners' Qdoba franchises. He applied for these letters of credit through FTCI and set

them up under the Trust's account at FTCI. (Stipulation of Facts, ¶ 37)

57.    In conjunction with this request for issuance of letters of credit, Jeffrey obtained and

supplied to FTCI a letter to FTCI constituting Elizabeth's written authorization for the Trust to obtain

these letters of credit for the benefit of Jeffrey's business.  The letter of authorization was drafted by

Jeffrey's law firm, Burns & Levinson, is dated February 13, 2004, and bears Elizabeth's signature.  Jeffrey

testified that he was sure that he had conversations with attorneys at Burns & Levinson about the need

for written authorization for these letters. In the letter of authorization, Elizabeth expressly consented

to the actions of Jeffrey, as trustee, "in signing any Application and Agreement for Irrevocable Letter of

Credit which will have the effect of pledging monies on deposit with you in the name of the above trust

to any Letter of Credit to be issued by you as follows, namely, that such Letter of Credit will be for the

business purposes of, and may benefit, various business entities of which Jeffrey R. Ackerman is a

principal."  The letter further capped the authorization at letters of credit aggregating $350,000 and

stated that no further authority would be required unless the sum of outstanding letters of credit exceeded that amount.

58.     On March 1, 2004, Fiduciary Trust extended a letter of credit in amount of $71,552.25 for the benefit of Chair 5. (Stipulation of Facts, ¶ 38)  On April 23, 2004, FTCI extended a letter of credit in the amount of $38,055 for the benefit of another of the Defendant's businesses, Chair 5 Restaurants Summer Street, LLC. (Stipulation of Facts, ¶ 39)  On May 13, 2005, FTCI extended a letter of credit in the amount of $35,000 for the benefit of another of the Defendant's businesses, Chair 5 Restaurants Porter, LLC. (Stipulation of Facts, ¶ 40)  On February 22, 2007, FTCI extended a letter of credit in the amount of $40,000 for the benefit of another of the Defendant's businesses, Chair 5 Restaurants – Harvard Square, LLC. (Stipulation of Facts, ¶ 41)

**J.    Private School Tuition**

59.     From 2004 through 2010, Jeffrey used trust monies totaling $261,608.05 to pay for his children's private elementary-school tuition, including $253,808.05 transferred from the Fiduciary Main Account and $7,800 transferred from the Trust's Bank Account. (Stipulation of Facts, ¶ 25)

60.     Jeffrey acknowledges that Elizabeth did not authorize these payments in writing.

61.     Jeffrey contends that Elizabeth knew about and fully supported his use of Trust monies for this purpose.  He testified that he asked his mother to be able to use Trust funds for his children's tuition when his oldest started school and "periodically every time," and that "she gladly accepted and did that and was proud of being able to do that, just like her father [Leo] had done for his grandson [Jeffrey]." Jeffrey did not testify to the precise substance of these discussions or indicate whether Elizabeth understood the amounts he intended to use for this purpose, much less that she expressly agreed to a specific amount. Jeffrey does not even contend that his mother authorized a specific sum, or a cap, or even that she provided an open-ended authorization, a blank check. He in effect contends that she provided oral authorization that did not specify what she was authorizing.

62.     Asked whether she had authorized $261,608.05 for payment of Jeffrey's children's tuition over the years, Elizabeth responded that she had not. Later, she testified that she never even had conversations with Jeffrey about use of trust funds for his children's tuition.

63.     Elizabeth's cousin, Edward Pollack, testified that he had had conversations with Elizabeth—the date or period of these conversations is specified only as "before this litigation was filed"—in which she told him that she was proud that she was helping Jeffrey with education for his kids.—Pollack's testimony was no more detailed than this; and later, when asked to supply the substance of the conversation in question, he indicated only that he had advised her to help Jeffrey send his children to private school.  Pollack also admitted to being unable to remember the substance of long-ago conversations.  I find his testimony of virtually no probative value and not cause to doubt the veracity of Elizabeth's testimony.

64.     It is hard to know where the truth lies here, but a few things are clear.  First, even Jeffrey does not contend that Elizabeth's alleged authorization, whatever it consisted of, was specific as to extent; he himself is nothing but vague about the content of her "authorization."  Second, the requirement of a writing was intended to avert this type of factual dispute, especially where the authorizing beneficiary is plagued by memory issues.  Third, Jeffrey knew about the requirement of a writing and, especially when appropriating monies for his family's own benefits—self dealing by a fiduciary—had special reason to adhere to the Trust's requirement, yet he did not; had he had Elizabeth's authorization, he likely would have obtained it in writing. In these circumstances, I find by a preponderance of the evidence that Elizabeth did not authorize, orally, a specific or unlimited sum of Trust monies for Jeffrey's children's tuition.

**K.  Purchase and Development of Livingston Road; Subordination of Mortgage**

65.      In June 2005, Jeffrey and Abigail decided to purchase the real property located at 121

Livingston Road in Wellesley, Massachusetts ("121 Livingston Road") and to build a new home there for

use as their family's residence.

66.      This was to be a luxury home. The land alone would cost $1,950,000.  The property

backed up to Charles River. When completed, the house had a basketball court with the Denver

Broncos' logo on it in its basement. Jeffrey testified that he and Abigail invested a total of $6.5 million

into the land and construction.

67.      The purchase and construction of 121 Livingston Road was not necessary for the

support or maintenance of Jeffrey and his family.  Jeffrey conceded at trial that the appropriations of

Trust money for 121 Livingston Road did not constitute distributions for his "maintenance and support"

within the meaning of Article I.B and 1.C of the Trust.

68.      To finance this purchase and construction, Jeffrey decided to use Trust assets.  He

initially asked FTCI for a loan in his own name, which loan would be secured by the securities of the

Trust of which FTCI was custodian. Upon reconsideration, Jeffrey asked FTCI to make the loan to the

Trust as borrower. Accordingly, FTCI did make a loan to the Trust, the loan taking the form of a $3

million line of credit.  Though the loan was entirely the obligation of the Trust and secured wholly by

Trust assets, its sole purpose was to fund the purchase and construction of 121 Livingston Road for the

benefit of Jeffrey's family.

69.      On June 10, 2005, Jeffrey as trustee signed a promissory note and security agreement,

pursuant to which FTCI extended a $3,000,000 margin line of credit (the "Fiduciary Line of Credit"),

Account No. ending in *****0718-1, secured by the Trust's stock and bond investments held by FTCI.

(Stipulation of Facts, ¶ 42)

70.     As the Trust was the borrower, advances by FTCI to the Trust under the Fiduciary Line of Credit were assets of the Trust.

71.     Jeffrey used the Fiduciary Line of Credit to purchase property and build a house in Wellesley, Massachusetts. (Stipulation of Facts, ¶ 43)

72.     In June 2005, Jeffrey drew $460,000 from the Fiduciary Line of Credit and transferred the funds to Peter Alexander Properties I, LLC ("PAP LLC"), a limited liability company established by Jeffrey and Abigail. (Stipulation of Facts, ¶ 44)  At all relevant times, all equity in PAP LLC was owned by Jeffrey and Abigail.

73.     On June 15, 2005, PAP LLC purchased 121 Livingston Road for $1,995,000 in a cash transaction. (Stipulation of Facts, ¶ 45)  Though the Trust effectively financed this transaction, it received in this transaction neither title to 121 Livingston Road nor a mortgage on the property.  All title went to PAP LLC.

74.     On June 22, 2005, Jeffrey drew an additional $2,408,759.81 from the Fiduciary Line of Credit, which he transferred to his attorneys Kertzman and Weil, LLP, who handled the closing, to fund the purchase of the property and the initial costs of constructing the house. (Stipulation of Facts, ¶ 46)

75.     On July 28, 2005 and September 9, 2005, Jeffrey made further draws from the Fiduciary Line of Credit of $85,000 and $45,000 respectively.

76.     Beginning on June 29, 2005, the Trust, by transfers from the Fiduciary Main Account to the Fiduciary Line of Credit, made twenty consecutive quarterly payments of interest on the outstanding balance of the Fiduciary Line of Credit.  The purpose of these payments was solely to enable the Trust to pay for the purchase and construction of 121 Livingston Road for Jeffrey's family.  The Trust made each of these interest payments; none were made by Jeffrey, Abigail, or PAP LLC, nor was the Trust ever reimbursed for these interest payments.

77.     During Jeffrey's tenure as trustee, the Trust made the following payments from the
Fiduciary Main Account to the Fiduciary Line of Credit to pay interest accrued on the outstanding
balance of the Fiduciary Line of Credit.  (Stipulation of Facts, ¶¶ 47, 51, 53-59, 61-65, 67, 68, 70, 71, 73,
75, 77)

| DATE | AMOUNT |
|---|---|
| 6/29/2005 | $3,482.09 |
| 9/28/2005 | 47,980.87 |
| 12/28/2005 | 32,321.98 |
| 3/28/2006 | 33,686.13 |
| 6/28/2006 | 42,294.41 |
| 9/28/2006 | 48,180.31 |
| 12/28/2006 | 54,495.25 |
| 3/28/2007 | 60,887.22 |
| 6/28/2007 | 62,316.40 |
| 9/28/2007 | 62,290.28 |
| 12/28/2007 | 57,168.30 |
| 3/28/2008 | 47,910.70 |
| 6/28/2008 | 38,985.96 |
| 9/29/2008 | 32,167.52 |
| 12/29/2008 | 26,153.05 |
| 3/20/2009 | 20,277.70 |
| 6/29/2009 | 20,728.33 |
| 9/28/2009 | 20,728.33 |
| 12/28/2009 | 20,503.02 |
| 3/29/2010 | 20,277.71 |
| **Total** | **$752,835.56** |

78.     After Jeffrey was replaced as trustee, the Trust made three further payments of accrued
interest on the outstanding balance of the Fiduciary Line of Credit as follows:

| DATE | AMOUNT |
|---|---|
| 7/23/2010 | 20,728.33 |
| 11/16/2010 | 20,991.04 |
| 1/19/2011 | 25,867.86 |
| **Total** | **$67,587.23** |

79.     The Trust thus incurred and paid total interest on the Fiduciary Line of Credit of $820,422.79.

80.     At no point while Jeffrey was trustee did he and Abigail have sufficient income between them to pay the interest on the Fiduciary Line of Credit, much less to repay principal.  They paid no portion of the interest the Trust incurred on the Fiduciary Line of Credit.   According to his federal tax returns for the years 2005 through 2009, Jeffrey reported losses from his various business interests of $491,000 in 2005, $554,221 in 2006, $947,520 in 2007, $3,952,402 in 2008 and $2,359,277 in 2009. (Stipulation of Facts, ¶17)

81.     On September 28, 2005, Jeffrey and Abigail bought 121 Livingston Road from PAP LLC for $1. (Stipulation of Facts, ¶ 48)  The deed of conveyance was signed by Jeffrey as manager of PAP LLC. It conveyed title to Jeffrey and Abigail as tenants by the entirety.  Jeffrey testified that PAP LLC made this conveyance solely for purposes of Jeffrey and Abigail's obtaining the mortgage loan that is the subject of the following paragraph, with the expectation that after having done so, he and Abigail would transfer title back to PAP LLC.  Be that as it may, Jeffrey and Abigail never did transfer title back to PAP LLC; until they sold the property in 2011, title remained in Jeffrey and Abigail as tenants by the entirety.

82.     When Jeffrey and Abigail purchased 121 Livingston Road from PAP LLC, they took out a $1,380,000 loan from Mortgage Network, Inc. ("MNI"); and to secure this loan, Jeffrey and Abigail gave MNI a mortgage on 121 Livingston Road.  (Stipulation of Facts, ¶ 49)

83.     In addition to the $1,380,000 MNI mortgage, Jeffrey and Abigail also granted a mortgage to Sovereign Bank to secure loan obligations owed by Jeffrey's restaurant business; the Sovereign Bank mortgage was subordinated to the MNI mortgage. (Stipulation of Facts, ¶ 50)  The date of the Sovereign Bank mortgage is not in evidence.

84.     On or around October 15, 2005, Jeffrey transferred $1,500,000 into the Fiduciary Main Account, which, in turn, was transferred to the Fiduciary Line of Credit to pay down its outstanding

balance. (Stipulation of Facts, ¶ 52)  Jeffrey made this payment from proceeds of his and Abigail's sale of

their Abbott Road house.  This payment reduced the principal balance of the Fiduciary Line of Credit

from $2,998,759.81 to $1,498,759.81.

85.     Over the succeeding fifteen months, Jeffrey drew down another $1,456,959.00 against

the Fiduciary Line of Credit, bringing its principal balance on January 10, 2007, to $2,955,718.81.

86.     On July 5, 2006, Jeffrey and Abigail transferred $92,500 to the Trust's Fiduciary Main

Account, and the next day, FTCI applied $85,041 of that sum to reduction of the principal balance of the

Fiduciary Line of Credit. Thereafter, they made no further payment on the Fiduciary Line of Credit.

87.     On January 18, 2007, Jeffrey, needing more funds for construction than he could take as

advances against the Fiduciary Line of Credit (which was then drawn to near its limit), directed FTCI to

transfer another $840,000 from the Trust to the bank account of Chair 5 Partners.[2]  FTCI did as it was

directed. The purpose of this withdrawal was to fund a portion of the construction cost of 121 Livingston

Road.  In the letter instructing FTCI to make this transfer, Jeffrey further instructed FTCI to book the

withdrawal "as a capital investment in [PAP LLC] and list this on the assets of the Miscellaneous Assets

account" of the Trust.  By that time, however, PAP LLC had transferred 121 Livingston Road to Jeffrey

and Abigail, and, in any event, the Trust never had an equity interest in PAP LLC.  At the time, PAP LLC

was a shell entity, without assets or income.  Nor did Jeffrey document this transfer of estate assets as a

loan to himself and Abigail, to PAP LLC, or to any entity. Jeffrey's instruction to record this transfer as a

capital investment in PAP LLC was a pure fiction.  This transfer of $840,000 was a gift of Trust assets to

Jeffrey and Abigail.

---

[2] Jeffrey explained, and I find, that he had the money transferred to a bank account of Chair 5 Partners only
because that entity had a bank account that could receive the money.  PAP LLC had no bank account.  Jeffrey
concedes that the money was destined for and used on 121 Livingston Road.  Chair 5 Partners served as only a
conduit for the funds.  Jeffrey offered no explanation as to why he had not simply had the funds transferred into
his own personal account.

88.     After January 10, 2007, Jeffrey made only three further appropriations from the
Fiduciary Line of Credit: $40,000 on August 21, 2007, and, much later, $30,000 and $10,000 on July 16
and 21, 2010.  Each appropriation was made for Jeffrey's personal use. The final two, in 2010, were used
for his family's expenses.  The specific use of the 2007 transfer is not in evidence.  All other
appropriations of principal from the Fiduciary Line of Credit were used to purchase and develop 121
Livingston Road.

89.     On March 31, 2006, Jeffrey and Abigail refinanced the MNI mortgage loan with another
$1,380,000 adjustable rate mortgage loan from Washington Mutual, and replaced the Sovereign Bank
mortgage with a new mortgage from Sovereign Bank, securing debts owed by the Defendant's
restaurant business. (Stipulation of Facts, ¶ 55)

90.     Construction of the home on 121 Livingston Road took much longer and cost more than
Jeffrey had originally anticipated.

91.     On April 4, 2007, Jeffrey and Abigail refinanced again and replaced the Washington
Mutual loan with a $4,063,500 adjustable rate mortgage loan from Chevy Chase Bank. (Stipulation of
Facts, ¶ 60)  With this loan Jeffrey and Abigail refinanced their existing first mortgage loan and obtained
a line of credit to use for construction purposes.

92.     On July 3, 2008, $500,000 was transferred from the Fiduciary Main Account to the
Fiduciary Line of Credit to pay down its outstanding balance. (Stipulation of Facts, ¶ 66)  This payment
by the Trust was necessitated by a declining stock market, which had reduced the value of the securities
that secured the Fiduciary Line of Credit and in turn caused FTCI to require that the loan be paid down,
to keep its loan-to-value ratio acceptable to FTCI.

93.     On March 13, 2009, Jeffrey and Abigail took out a $500,000 revolving credit mortgage
with Needham Bank, secured by a further mortgage on 121 Livingston Road; the Needham Bank
mortgage was subordinated to the Chevy Chase Bank mortgage. (Stipulation of Facts, ¶ 69)

94.     The Sovereign Bank mortgage was discharged on August 28, 2009. (Stipulation of Facts, ¶ 72)

95.     In September 2009, Gad Liwerant ("Liwerant"), who owned a fifty percent interest in Jeffrey's restaurant business, brought a lawsuit in the Suffolk Superior Court against Jeffrey, arising out of a dispute concerning Jeffrey's agreement to buy out Liwerant's interest in the restaurant business. (Stipulation of Facts, ¶ 78)

96.     In late 2009 and 2010, Jeffrey and his restaurant business were also experiencing pressure from creditors.

97.     On December 4, 2009, Jeffrey recorded a declaration of homestead on 121 Livingston Road. (Stipulation of Facts, ¶ 74)  He did this to protect the remaining equity in the property.  Under Massachusetts law, the recording of this declaration would have protected up to $500,000 of the equity in the property.  Jeffrey testified that he had received an offer to purchase 121 Livingston Road of $10,000,000.  He believed there might be considerable equity (after payment of the Chevy Chase Bank and Needham Bank mortgages) to protect, much more than the declaration of homestead alone could protect.

98.     In February 2010, Jeffrey and Abigail, fearful that Liwerant would in his lawsuit attach the remaining equity in 121 Livingston Road, executed and recorded against that property a $1,500,000 mortgage in favor of the Trust ("the Trust Mortgage"), subject to the Chevy Chase Bank mortgage and the $500,000 revolving credit mortgage to Needham Bank. (Stipulation of Facts, ¶ 76)

99.     The Trust Mortgage indicated that it was being granted "for consideration paid," but it did not specify the consideration paid.  The mortgage also stated that it was being granted "to secure the obligations under a certain Agreement dated August 31, 2006 hereof[.]"  The "Agreement dated August 31, 2006 hereof" is not otherwise identified, and no evidence has been provided of an agreement of that date; I find that there was no Agreement of that date.  However, attached to and filed

with the Trust Mortgage was a promissory note, entitled Demand Promissory Note and dated, it states, "as of January 31, 2008." The promissory note recites that the Borrowers, Jeffrey and Abigail, promise to pay on demand to the order of the Trust the principal sum of $1,500,000, together with interest "at the rate which is equal to the Applicable Federal Rate as of the date hereof." The term Applicable Federal Rate, though capitalized, is not otherwise defined in the promissory note. Also, despite its title and its promise to pay on demand, the promissory note also recites that it is due and payable on January 31, 2018 or, if sooner, upon the sale of 121 Livingston Road. Also, though it is dated "as of January 31, 2008," Jeffrey conceded at trial that it was executed contemporaneously with the mortgage, in February 2010. There is no evidence as to why the obligation reflected in the promissory note, and secured by the mortgage, was fixed at $1,500,000. In fact, the purpose of the Trust Mortgage and the accompanying promissory note was only to deceive Liwerant about the extent of available equity in the property and to keep the equity in the family—better to lose that equity to the Trust than to Liwerant. In view of its timing and its unintelligibility on the interest the promissory note accrued and indeed on the obligation the mortgage secured, the mortgage and promissory note were by no means intended to protect the Trust.

100.    On April 14, 2010, and as expected, Liwerant recorded a $1,123,101 pre-judgment lien on 121 Livingston Road which he had obtained against Jeffrey. (Stipulation of Facts, ¶ 79)

101.    Jeffrey and Liwerant subsequently settled the lawsuit, and, as part of the settlement, Liwerant discharged the attachment. (Stipulation of Facts, ¶ 80) In order to obtain Liwerant's agreement to release his attachment, Jeffrey agreed to pay him $350,000. In order to raise this money, Jeffrey and Abigail borrowed further against 121 Livingston Road. They approached Needham Bank for this further loan. Needham Bank agreed to make the loan on the condition that the Trust agree to subordinate the Trust Mortgage to the mortgage securing this further borrowing. Jeffrey, as trustee, agreed to and did subordinate the Trust Mortgage to the mortgage to Needham Bank that secured this

further borrowing. In doing so, Jeffrey effectively gave away $350,000 of the value of the Trust

Mortgage to abate his own personal liability to Liwerant.  Elizabeth did not approve of this

subordination in writing.  Jeffrey seeks a finding that he discussed the subordination with her, but he did

not actually testify to that effect, and there is no evidence to support the proposition. Indeed there is no

evidence to indicate that Elizabeth knew of the existence of the Trust Mortgage, and there is evidence,

which I credit, from both Matt and Elizabeth that she was later surprised to learn of the existence of this

mortgage.  I find that Elizabeth did not by any means approve of the subordination of the Trust

Mortgage.

102.     On June 14, 2010, Jeffrey and Abigail did borrow an additional $350,000 from Needham

Bank and, to secure this loan, granted a mortgage on 121 Livingston Road to Needham Bank, to fund the

rest of the settlement. (Stipulation of Facts, ¶ 81)

103.     In January 2011, after Jeffrey was replaced as trustee, the Trust, through its new co-

trustees, paid FTCI $2,561,586.67 to pay off the Fiduciary Line of Credit in full. (Stipulation of Facts, ¶ 82)

This amount included the principal balance of $2,535,718.81 and accrued interest of $25,867.86.

104.     Jeffrey and Abigail initially listed 121 Livingston Road for sale at approximately

$6,950,000. (Stipulation of Facts, ¶ 83)  On March 17, 2011, they sold 121 Livingston Road for

$5,600,000. (Stipulation of Facts, ¶ 84)

105.     After all of the other mortgagees were paid off, the Trust, whose mortgage was the

most junior encumbrance, received just $182,000 out of the net proceeds from the sale of 121

Livingston Road. (Stipulation of Facts, ¶ 85)  The Trust received this sum on account of the Trust

Mortgage.  Most of the proceeds of the sale abated obligations of Jeffrey and Abigail to senior

mortgagees, but Jeffrey and Abigail received no cash from the proceeds. The $182,000 received by the

Trust was all that remained of the sale proceeds after payment of senior obligations.

106.    In summary, Jeffrey took Trust monies totaling $5,375,718.81—including advances against the FTCI line of credit of $4,535,718.81 and the separate distribution of $840,000—to fund his and Abigail's acquisition and construction of 121 Livingston Road.  These advances in turn caused the Trust to incur and pay interest obligations totaling $820,422.79, bringing total outlays by the Trust for the purchase and construction of 121 Livingston Road to $6,202,141.60.  Of this sum, Jeffrey and Abigail repaid $1,682,000—$1,500,000 upon sale of Abbott Road in 2005, $85,041 on July 6, 2006, and $182,000 upon sale of 121 Livingston Road in 2011—leaving the Trust with a net loss of $4,435,100.60.[3]

107.    Elizabeth did not approve in writing of Jeffrey's use of Trust monies for the acquisition and development of 121 Livingston Road.

108.    Jeffrey contends that Elizabeth knew about and orally authorized him to use Trust assets for the acquisition and development of 121 Livingston Road.  Elizabeth denies this.  Neither Elizabeth nor Jeffrey is wholly credible here. This is the kind of disagreement that the requirement of approval *in writing* was intended to avert, and the lack of an approval in writing tends to place in doubt Jeffrey's contention that Elizabeth approved this use of Trust money at all. Had Elizabeth authorized this use of Trust monies in the several millions of dollars—approximately 50 percent of the value of the Trust in 2005 and 2006[4]—Jeffrey would likely have had her put the authorization in writing.  In any event, the evidence does not establish that Elizabeth had knowledge of the *amount*, an extraordinary amount by any measure, of Trust monies that Jeffrey intended to or did use on this property. Nor does he quote her words of authorization—not the exact words, and not even their gist or import—much less contend that they involved specific dollar authorizations or even an open-ended authorization. I find that Elizabeth did not orally or by any means authorize Jeffrey's use of Trust money for 121 Livingston Road in any amount.

---

[3] I do not suggest that this constitutes a full quantification of the Trust's damages.
[4] The Trust's assets, consisting mostly of securities, lost about half of their value in the economic crisis of 2007 and 2008.

109.     Jeffrey testified that the use of Trust money for 121 Livingston Road was an investment on the part of the Trust, and he suggested, but quite vaguely, that the investment took the form of a loan. This testimony is not credible and does not fit the evidence.

110.     First, the Trust never had title to 121 Livingston Road,[5] and it held no equity interest in PAP LLC, which for a time held title to the property.  Title to the property was always either in PAP LLC or Jeffrey and Abigail as tenant by the entirety.  Neither PAP LLC nor Jeffrey and Abigail held title for the Trust; Jeffrey does not contend otherwise, and there is no evidence of an agreement between the Trust and either PAP LLC or Jeffrey and Abigail establishing a relationship of this nature.  Indeed, insofar as Jeffrey specified the nature of the Trust's alleged investment, he testified that it was in the nature of a loan.  He did not contend that it consisted of an equity interest.

111.     Second, though Jeffrey contends that the Trust's investment took the form of a loan, this is implausible and not credible.  A loan to whom, for how long, in what amount, at what interest rate?  Jeffrey has specified none of this.  He has offered no evidence of the existence of a loan agreement, whether written or otherwise.  The Trust Mortgage and accompanying promissory note were executed in 2010, years after all but the last $40,000 of the distributions at issue; and though the Trust Mortgage indicates that it was given to secure an "Agreement dated August 31, 2006," there is no corroborative evidence of the existence of such an agreement, much less evidence of its terms and content. And even August 31, 2006 followed $3,830,618 of the disbursements at issue.

112.     The contention that the Trust's disbursements for 121 Livingston Road were an investment in the form of a loan is also implausible for the further reason that, as executed, it was nothing but a losing proposition, with no possible upside for the Trust.  The Trust borrowed the money it advanced to Jeffrey and Abigail for 121 Livingston Road, but there is no evidence that Jeffrey and Abigail, or any obligor on their behalf, undertook an obligation to compensate the Trust for this interest.

---

[5] I set aside for the moment such title as the Trust may have held by virtue of the Trust Mortgage.

So even if the principal were repaid in full, the Trust would still suffer a considerable net loss.  Second, repayment of principal was hardly assured:  Jeffrey did not document "the loan," and an undocumented loan is difficult to enforce in court; Jeffrey did not secure the loan with a mortgage (not until years after the money was appropriated, and even then he subordinated the mortgage to all other encumbrances); and Jeffrey and Abigail had no plan for repayment of the principal (beyond the initial $1,500,000 which they replaced in short order).  Jeffrey said perhaps they'd be able to repay by refinancing 121 Livingston Road, but he conceded that they lacked the wherewithal to service the Trust's own interest obligations for the moneys advanced; therefore, I find, they would also have been unable to undertake the interest obligations entailed by a refinancing, and I further find that Jeffrey well understood this.  Jeffrey also testified that the loan could be repaid upon resale of the property, but (i) this would have defeated their purpose in developing it, which was to use it as their home (as evidenced by the fact that Jeffrey did not accept the $10 million offer he says he received), and (ii) it also assumed sufficient value in the property upon sale to repay the advances, which was hardly assured (especially where he did not secure "the loan" with a mortgage) and turned out not to be the case.  Also, upon sale, the Trust would have received only repayment of the advanced monies, not a share in the equity; at best, the Trust could recoup its outlays, nothing more.  And it is unlikely that, had investment been his purpose, Jeffrey would have committed so large a fraction of the Trust's assets—approximately fifty percent, at the outset—to this one investment.  As an investment, a "loan" of this character made no sense.

113.     For all these reasons, I find that Jeffrey's advances of Trust monies for 121 Livingston Road were neither a loan nor an investment of any kind on the part of the Trust. They were simply, in fact and in Jeffrey's understanding at the time, appropriations of Trust money for Jeffrey's own purposes.  The fact that Jeffrey and Abigail repaid some of the appropriations—as with the $1.5 million of proceeds from the sale of their Abbott Road property—does not make the appropriations loans.

### L.  The Vail Condo

114.     In June 2007, Jeffrey created a Colorado limited liability company called LG Capital, LLC

("LG Capital"), to purchase a timeshare condominium unit located in the Vail, Colorado area (the "Vail

Condo"). (Stipulation of Facts, ¶ 31)  At all relevant times, LG Capital had only two members, Jeffrey and

Matt, each with a 50 percent interest.

115.     The purchase price for the Vail Condo was $630,000. (Stipulation of Facts, ¶ 32)  The

purchase of the Vail Condo was financed in part by a $500,000 loan from Alpine Bank (the "Alpine Bank

Loan"). (Stipulation of Facts, ¶ 33)  The remainder of the purchase price, $130,000 was funded by equal

equity contributions to LG Capital, made in the names of Jeffrey and Matt but funded wholly by the

Trust.

116.     The Trust, Jeff, Abby and Matt were guarantors of the Alpine Bank Loan. (Stipulation of

Facts, ¶ 34)

117.     Elizabeth had urged Jeffrey to purchase a condo or timeshare in Vail where he and Matt

could stay when they were visiting her there.  She often stayed in Vail at a particular hotel that suited

her well, and the Vail Condo was next door to this hotel and shared facilities with it.  Vail was a favorite

destination for all the family. This condo would allow Jeffrey, his family, and Matt to visit and stay near

her; Jeffrey characterized it as like having two places in one big house. Clearly Elizabeth expressed to

Jeffrey that she wanted him, as Trustee, to purchase something of this nature in Vail.

118.     However, she did not approve in writing of this particular purchase, of the amount paid,

or of the manner in which the purchase was financed and held, involving as it did a transfer of $130,000

to and for the benefit of Jeffrey and Matt and placement of the condo in LG Capital's ownership, not the

Trust's.  It is entirely unclear what she knew and approved about these details.  On cross-examination,

Elizabeth testified that she understood that Matt "was a co-owner of the condo through LG Capital,"

and that this ownership interest must have been funded by the Trust, but I have no evidence as to

whether, *before* the transactions occurred, she understood that Matt and Jeffrey *would become* co-owners, by virtue of gifts from the Trust.

119.    LG Capital eventually defaulted on the Alpine Bank loan; the date of default is not in evidence.

120.    After LG Capital defaulted on the Alpine Bank Loan, Alpine Bank sued the Trust as a guarantor of the loan in state court in Colorado. (Stipulation of Facts, ¶ 35)  In the same action, Alpine also sued Jeffrey, Abigail, and Matt on their guarantees. Around the same time, and perhaps in the same proceeding, Alpine Bank also commenced foreclosure proceedings against the Vail Condo.  After Jeffrey was replaced as trustee, LG Capital, Alpine Bank, and the four guarantors reached a settlement under which LG Capital sold the Vail Condo and, from the proceeds, paid Alpine Bank a total of $491,307.24 and paid the condo association's fees and dues of approximately $32,000. As indicated in the statement of settlement from the closing, surplus proceeds of $9,163.58 were distributed to LG Capital.

### M.  Jeffrey's Jamaica Birthday

121.    In August of 2007, to celebrate his fortieth birthday, Jeffrey organized a four night trip to a resort in Jamaica for fifteen people.  Jeffrey paid for virtually all expenses of the trip for all the invitees, including a chartered jet, accommodations, food, liquor, and cups that said "Drinks on Jeff."

122.    Jeffrey conceded that the cost of this excursion totaled at least $30,000 and perhaps was as much as $40,000; "$30,000 to $40,000 sounds about right," he testified.

123.    Jeffrey used Trust assets to fund most if not all of these expenses.  The precise extent is not in evidence.

124.    Though he contends that he discussed this trip with his mother a lot, he did not obtain her written approval to underwrite it with Trust monies.  He did not testify that she approved it at all.

### N.  Payment of American Express Charges

125.    The complaint seeks a determination that Jeffrey used Trust monies to fund payment of

charges by Abigail to her own American Express credit card account.  The record is virtually devoid of

evidence in support of these allegations.  The Trust has failed to sustain its burden of proof as to

misappropriation of Trust monies for this purpose.

### O.  Acquisition of Interest in Sportvision

126.    In its complaint, the Trust seeks a determination that Jeffrey's self-appropriations from

the Trust included use of Trust assets to purchase shares in a corporation identified as Sportvision, Inc.,

and that he transferred these shares to his wife, Abigail, to put them beyond the reach of existing

creditors.  The record includes no evidence about the Debtor's acquisition of shares in Sportvision, Inc.

or transfer of any such shares to Abigail.  Nor does the Trust now appear to seek findings as to these

issues.

### P.  Down Payment on Matt's Condo

127.    In 2007, Matt, who was then living in the Boston area and employed by Chair 5 Partners,

purchased a condominium in the Boston area.  Elizabeth approved of the use of Trust money to make

the down payment on that purchase but did not put her authorization in writing.  Jeffrey did appropriate

Trust money for this purpose; the amount is unclear.  (The Trust does not now seek relief as to this

distribution.)

### Q.  Practice of Oral Authorization?

128.    Jeffrey seeks a finding that Elizabeth's practice over the course of the twelve years of

Jeffrey's trusteeship with respect to making distributions of Trust funds "was to have Jeffrey act on oral

authorizations." I do not so find. I find that it was Jeffrey's practice, in most but not all instances, to

make distributions without Elizabeth's written authorization.  In every instance, he well knew that her

authorization in writing was required by the Trust.  Elizabeth supplied written authorization on several

occasions. And he further knew that without her authorization in writing, he had no authority to make a

distribution to or for the benefit of himself.  He further knew that, without her written authorization, he

had no *obligation* to make such a distribution, even if she directed him to do so. He did not testify, and

no evidence has been adduced to show, that he felt himself *compelled* or *required* by Elizabeth to make

any of the distributions in issue here.[6] He knew that the decision whether to proceed, and the

responsibility *not* to proceed, without written authorization were his own.

129.      I further find that, if and when Elizabeth authorized a distribution of Trust assets for

Jeffrey's own use, Jeffrey had several special reasons to obtain that authorization in writing.[7]  He knew

his mother had memory issues.  He knew that during periods of substance abuse, she had a record of

being less than truthful.  He feared that Alan Weiss, if he were to obtain information about the Trust,

might make trouble for him (Jeffrey). And he knew that Matt, a residual beneficiary of the Trust, was

being kept in the dark about the Trust's affairs and that, as trustee, he might someday be called by Matt

to account for his handling of the Trust's assets.  Each of these was a good reason to have a written

record of Elizabeth's authorization, and Jeffrey was keenly aware of all of them.  It follows that the

absence of a written authorization for a particular distribution for Jeffrey's personal or business use is a

good indication that Elizabeth did not authorize the distribution at all.

130.      Jeffrey seeks a general finding that the Trust failed to show by a preponderance of the

evidence that he had the requisite scienter for the various self-appropriations of Trust funds to

constitute defalcations, based on, among other things, discussions with Elizabeth about those

transactions and authorizations granted by her. I find, to the contrary, that as to each transaction in

---

[6] In all instances save that of the Vail Condo, Jeffrey, not Elizabeth, was the driving force behind the distribution.
And even in the instance of the Vail Condo, what Elizabeth wanted was for the Trust to purchase a condo or
timeshare in Vail. I have no evidence that it was she who conceived of the idea of a purchase, funded by the Trust,
by an LLC that the Trust had no interest in.
[7] By "special" I mean reasons beyond the most obvious:  that the Trust required written authorization, that the
distributions in issue involved self-dealing, and that the amounts at issue were, in the aggregate and in some
instances individually, large and consequential to the health of the Trust.

issue, the Trust has established that he acted with the requisite scienter.  In each instance, he knew of the requirement of an authorization *in writing*, and in each instance he proceeded notwithstanding his knowledge that he did not have the necessary writing.  He deliberately and knowingly violated the terms of the Agreement of Trust. I reject any suggestion that he was confused about the necessity of a writing. He did not testify that he understood that the Trust's requirement of a writing to be obviated by his possession of Elizabeth's power of attorney; I find that he labored under no such misunderstanding. Jeffrey also seems to contend that he understood the requirement of a writing to be obviated where he had a non-written indication of Elizabeth's authorization. I do not so find; such an understanding would nullify the requirement of a writing, and Jeffrey fully understood and appreciated that a writing was required even when authorization was already otherwise indicated.  He knew, for example, the Elizabeth's memory was less than perfect and that an interested third-party, Matt, was not privy to the conversations and events on which Jeffrey claims to have understood Elizabeth to have given her authorization. In addition, this whole line of defense is dependent on proof that Elizabeth *did* authorize the disbursements in question other than in a writing, and I have found that proof of authorization has in every instance been insufficient or wholly lacking. I find by a preponderance of the evidence, that in each instance Jeffrey acted with full appreciation of the wrongfulness of the appropriation in two respects: for lack of written authorization and, independently, for lack of authorization.

### R.  Denouement

131.     At some point after he completed college, Matt moved to the Boston area.  In May or July 2006, Jeffrey hired him to work for Chair 5 Partners, in whose employ he remained until the summer of 2010. During these years, Matt spent a great deal of time with Jeffrey and his family and until events in 2010, his relationship with Jeffrey was strong, enthusiastic, and trusting.

132.     In March 2008, Mathew invested $250,000—virtually the entire proceeds of a separate Trust that Leo Werner had established for him, and virtually all Matt's resources at the time—in Chair 5

Partners.  I take this as a measure of the trust and confidence that Matt placed in Jeffrey and his

financial leadership at that time.

133.     Later in 2008, Matt received a raise at Chair 5 Partners, but Jeffrey also told him that it

was going to be difficult to make the raise happen "within the parameters of Chair 5" because Chair 5

Partners did not then have the cash flow to pay him more. Jeffrey told Matt that he could make the raise

happen by supplementing Matt's income with distributions from the Trust.

134.     From December 2008 until sometime in 2010, Jeffrey distributed $5,000 per month

from the Trust to Matt for his support.  Elizabeth testified that she approved of these distributions.  She

did not put her approval in writing.  (The Trust does not now seek relief as to these distributions.)

135.     In the summer of 2009, Matt began to realize that Chair 5 Partners was ailing financially.

Later that year he began thinking about leaving Chair 5 Partners and moving to Colorado.

136.     Over the duration of his trusteeship, Jeffrey concedes, he had deliberately kept Matt in

the dark about the terms of the Trust, the extent and composition of its assets, and the uses to which

Trust monies had been and were being put. Matt had only a limited understanding of the Trust.  He

knew little else than that it existed for the benefit of his mother, but that he and Jeffrey were also

beneficiaries, and that, to some extent, it could be used for his and Jeffrey's support.

137.     By 2009, if not earlier, Matt began asking Jeffrey for more information about the Trust.

It had become apparent to Matt that, in view of the financial difficulties at Chair 5 Partners, Jeffrey and

Abigail were living well beyond their means, and he began to suspect that they were doing so with Trust

assets.  For many months, when Matt asked for information about the Trust, Jeffrey would put him off.

138.     In 2010, Matt's inquiries became more insistent. In or around April 2010, Jeffrey,

through email, began sharing information about the Trust's assets with Matt.  Matt learned that Jeffrey

had used Trust funds for his own personal use, including, he understood, $1.5 million on construction of

121 Livingston Road and other sums for education of his children at private schools.  (Jeffrey had given

him a copy of the Trust Mortgage, and from this Matt mistakenly surmised that the amount

appropriated for 121 Livingston Road was only $1.5 million.)

139.    In an email of March 21, 2010, Jeffrey stated that he was not at that time using Trust

funds for his business, but that he was indeed using Trust funds "to support myself during this time." In

another email, dated July 2, 2010, Jeffrey again gave Matt reason to understand that he was continuing

to use Trust resources to fund his expenses: "You also need to know that I am doing everything I can to

limit and hopefully in very near term, eliminate my expenses from the Trust."  It is clear that, in 2010,

Jeffrey was appropriating Trust money to pay his family's expenses.  The extent of these appropriations,

and the precise manner in which they were made, remains unclear.

140.    Throughout this period, Matt pressed for more details but Jeffrey, knowing it would lead

to a major reckoning, and facing a number of other serious financial and business crises that demanded

his attention, continued to put him off.  In this period, Matt's trust in Jeffrey wholly evaporated.

141.    In August 2010, Elizabeth learned—by what means is not clear, but not from Jeffrey—

that the Trust had a mortgage on 121 Livingston Road. This surprised her, and she mentioned this to

Matt when he visited her that month in Colorado.  At this point, Matt, believing his mother needed to be

informed, told her what he had learned about Jeffrey's use of Trust assets for his own purposes.  "I

discussed with her that she needed to get an attorney and to start figuring out what was going on with

her trust."

142.    Elizabeth immediately contacted and, in short order, met with and retained attorney

Mehrtens to advise and represent her in the matter.

143.    When Jeffrey learned that Matt had raised these issues with their mother, and that she

in turn had brought an attorney into the matter, he was furious with Matt and poured his fury into a

lengthy email.  In this email, he expressed among other things grave disappointment that Matt had

involved their mother in what he wanted to remain a two-person matter, between the brothers alone,

about the uses to which he had put Trust resources.[8] He had indicated the same belief and desire in previous emails in this correspondence.  This expressed sentiment belies Jeffrey's repeated insistence at trial that his mother was aware of and had authorized his extensive use of Trust assets for his own purposes, especially for 121 Livingston Road, and that he had kept her aware of the state of the Trust's finances.

144.    On September 1, 2010, Elizabeth, through Mehrtens, sent Jeffrey a letter that (i) immediately revoked the power of attorney that she had given him, (ii) demanded his immediate resignation as trustee of the Trust, and (iii) demanded by September 10, 2010, a full and detailed financial accounting for the Trust since June 1, 2005.  By letter to Elizabeth dated September 10, 2010, Jeffrey resigned as trustee of the Trust, effective immediately.

145.    On September 27, 2010, a meeting of at least four hours' duration was held in Boston at the offices Barry Gold, an attorney whom Matt had retained to advise and represent him in conjunction with these matters. In attendance were Gold, Mehrtens, Litvak, Elizabeth, Jeffrey, Abigail, and Joe Volman, an attorney who was representing Jeffrey.  At the meeting, Jeffrey addressed in detail his use of Trust assets during his tenure as trustee and the state of the Trust's affairs as of that date. At the close of the meeting, he also supplied to Mehrtens an extensive and detailed spreadsheet in which he appears to have accounted for all withdrawals from the Fiduciary Main Account over the twelve years of his tenure.

146.    At the meeting Jeffrey made a request that the Trust continue to make monthly distributions to him and Abigail for their living purposes going forward, "somewhere in the $20,000 to $30,000 range, could be as high as $40,000," Mehrtens remembered.

---

[8] In an email of August 3, 2010, he ended:  "There is still plenty of money between these trusts"—meaning the Trust and the Anne Werner Trust—"for a rebalancing between us."  He hoped to buy Matt's silence, and with Trust assets.

147.    On or around September 30, 2010, Elizabeth appointed Mehrtens and his partner, Lawrence Litvak, as co-trustees of the Trust.  As trustees, Mehrtens and Litvak immediately set about determining the extent of the Trust's remaining assets, understanding better the state of its finances and affairs, and obtaining a full accounting and understanding of Jeffrey's dealings with the Trust's assets.

148.    In the early months of their trusteeship, Mehrtens and Litvak (i) settled the lawsuit regarding the Trust's liability for the mortgage on the Vail Condo, (ii) paid off from Trust assets the Fiduciary Line of Credit in order to avert continuing accruals of interest thereon, and (iii) received the net proceeds of $182,000 from the sale of 121 Livingston Road. After having done these things, the Trust's remaining assets (aside from Elizabeth's home) had a total value of between $800,000 and $900,000, down from $10.5 million when Jeffrey began his tenure as trustee.

149.    From when he was first asked by Elizabeth and then the co-trustees for an accounting, Jeffrey has been forthcoming and cooperative about his management of and disposition of Trust assets and about the extent of his appropriations for himself and other entities and persons.  Most if not all of these transactions can be reconstructed from available records of FTCI, Bank of America, and other financial institutions.  Jeffrey was able to generate this accounting quickly (within 30 days, which was quick for the size of the task) and meticulously.  His accounting was not complete—there remain loose ends and questions—but appears to have satisfactorily covered most of the necessary ground.

150.    Jeffrey's accounting and testimony have been much less transparent and credible—I have found them to be largely not credible—where they have concerned (i) the extent to which certain uses for individuals and entities other than Elizabeth or the Trust were authorized by Elizabeth and (ii) the character of certain uses of Trust property, such as whether transactions appearing to be outright gifts were instead loans or investments in the name of another entity for the Trust.

151.    From the time he was appointed trustee in 1998 until he resigned in September 2010, Jeffrey used funds and assets of the Trust for his own personal and business use, including $162,839.29 from the Fiduciary Trust main account, $840,000 from the Fiduciary Trust miscellaneous account, and $4,921,950.71 from the Trust's Bank Account, for a total of $5,924,790. (Stipulation of Facts, ¶ 23)

152.    In addition to the $5,924,790 that Jeffrey admits that he used for his own personal and business expenses, Jeffrey also used additional funds belonging to the Trust to pay for the benefit of his family and his various business interests. (Stipulation of Facts, ¶ 24)

153.    The combined total of Trust assets that Jeffrey diverted for his own personal benefit or business use is at least $7.2 million, and perhaps as much as $1 million more.  Though Jeffrey and Abigail replaced some of the monies that Jeffrey appropriated for his personal and business purposes, the appropriations resulted in a net loss to the Trust of most of its value.

**JURISDICTION**

The matter before the court is a proceeding under 11 U.S.C. § 523(a) to determine the dischargeability of asserted claims. It arises under the Bankruptcy Code and in a bankruptcy case and therefore falls within the jurisdiction given the district court in 28 U.S.C. § 1334(b) and, by standing order of reference, referred to the bankruptcy court pursuant to 28 U.S.C. § 157(a). It is a core proceeding within the meaning of 28 U.S.C. § 157(b)(1) and (b)(2)(I) (core proceedings include determinations of the dischargeability of particular debts). The bankruptcy court accordingly has authority to enter final judgment on the complaint. The Court abstains under 28 U.S.C. § 1334(c)(1) from the Trust's demands to adjudicate Jeffrey's liability to the Trust.

**DISCUSSION**

The Trust seeks to except the alleged liability of Jeffrey to the Trust from discharge on diverse bases under § 523(a)(2)(A) and (a)(4). With respect to each basis, the Trust, as the party seeking to establish the nondischargeability of a debt, bears the burden of proving each element of the exception

by a preponderance of the evidence. *Palmacci v. Umpierrez*, 121 F.3d 781, 787 (1st Cir. 1997) (citing

*Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)).  As the liability in issue

arises from numerous distinct (alleged) breaches of fiduciary duty, each giving rise to its separate

measure of liability, the Trust must prove each element as to each component of the debt or liability in

issue.

### a.   Count I: for Determination of Nondischargeability under § 523(a)(2)(A)

In Count I, the Trust seeks a determination of nondischargeability under § 523(a)(2)(A) on four

articulated factual bases.  With respect to three of these, the Trust does not now request findings and

rulings; accordingly, they are deemed withdrawn and waived as bases for relief under § 523(a)(2)(A).[9]

The fourth and remaining basis is a sprawling matter, with allegations only at the highest level of

generality, that seeks a determination of nondischargeability as to each and every one of the Debtor's

appropriations of Trust monies for his own benefit, on the basis that he converted these monies to his

own use "by false pretenses, false representations, or actual fraud." Though this count sounds in fraud,

as to no particular appropriation of monies did the Trust, in Count I of its complaint or at any time

before trial, indicate with particularity the circumstances that constitute the false pretenses, false

representations, or actual fraud on which it relies.  Nor has the trust ever indicated, even in its post-trial

memorandum, which of these three alternate legal bases—false pretenses, false representations, or

actual fraud—is the legal basis on which it relies for any particular appropriation.

In his post-trial memorandum, the Debtor contends, as to this count, that the Trust failed to

plead any misrepresentation with sufficient particularity to put him on notice of the fraud allegations

---

[9] In the first of these, set forth in ¶ 113 of the complaint, the Trust alleges that "Debtor, in concert with his
attorneys, prepared a fraudulent $1.5 million mortgage on the 121 Livingston House, memorializing a fictitious
"loan" from the Trust, which actually comprised funds that he had fraudulently converted from the Trust's assets."
In the second and third, at ¶¶114-16 of the complaint, the Trust alleges two fraudulent transfers by the Debtor:
that the Debtor transferred his interest in an entity known as Sportvision to his wife, and that he transferred his
proceeds from the sale of another entity to the Abigail Ackerman Trust.  These factual bases are nowhere
addressed in Plaintiff's Post-Trial Memorandum (see esp. pp. 20-23 thereof).

against which he had to defend. The Court agrees. Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a

party must state with particularity the circumstances constituting fraud or mistake."), made applicable

by Fed. R. Bankr. P. 9.  Indeed, it is impossible, even with the benefit of the Trust's post-trial brief, to

understand what precisely is the gravamen of this count, much less how it applies to any one of the

numerous self-appropriations of trust monies that are the subject of this proceeding. This count must

accordingly be dismissed for failure to plead it with particularity.

For two reasons, this count also fails to state a claim on which relief can be granted.  First, the

Trust does not allege that Jeffrey made an affirmative misrepresentation, only that he failed to make

one or more of the periodic reports of the state of the Trust's finances that the Agreement of Trust

required of him.  To make out a claim under § 523(a)(2)(A) on the theory alleged, the Trust is required to

prove a false representation.  An omission can amount to a false representation, but only in

circumstances where the omission is a *de facto* statement, such as where a debtor is required by a

bankruptcy schedule to list all transfers within two years before his bankruptcy filing—the debtor's

failure to list a particular transfer can be a representation that there was no such transfer.  But a debtor

who, as here, fails to make a required report as to the complex and extensive holdings and affairs of a

trust does not thereby represent anything in particular.  He merely has failed to report.  This may

constitute a breach of his duty to report and even concealment of wrongdoing; but it is not a

representation, false or otherwise.

Second, even if the failure to report were a false statement that Jeffrey had committed no

unauthorized self-dealing, it still did not give rise to any of the liability in issue.  At worst, it created the

climate in which Jeffrey was permitted to continue his self-dealing; it did not necessitate or cause

further self-dealing.  In short, even if the failure to report were fraud or a false representation within the

meaning of § 523(a)(2)(A), it nonetheless did not cause any further liability for self-dealing to arise.

Section 523(a)(2)(A) excepts from discharge not debts for false representation or actual fraud, but (as

relevant here) "any debt . . . for money . . . *to the extent obtained by* . . . a false representation or actual

fraud." 11 U.S.C. § 523(a)(2)(A).  Jeffrey's alleged failures to report did not themselves cause further acts

of misappropriation; they were not, to a sufficient extent, the means by which further misappropriations

were effected.

For these reasons, the Trust is entitled to no relief under § 523(a)(2)(A).

**b.  Larceny under § 523(a)(4)**

In Count II of its complaint, the Trust demanded a determination that the liability of the Debtor

to the Trust for his self-appropriation of Trust monies is excepted from discharge on each of the four

legal bases in § 523(a)(4), including that the debt is, at least in part, one for larceny.  Subsection

523(a)(4) excepts from discharge, in relevant part, "any debt for  . . . larceny." 11 U.S.C. § 523(a)(4).  In

its Post-Trial Memorandum, however, the Trust requests no ruling that any part of the Debtor's liability

to the Trust is liability for larceny.  Accordingly, larceny is deemed withdrawn and waived as a basis for a

determination of non-dischargeability.  And I am satisfied that the bad acts of which the Trust complains

are not in the nature of larceny.

**c.  Defalcation while Acting in a Fiduciary Capacity**

In Count II, the Trust further seeks a determination of nondischargeability as to the Debtor's

liability for each and every appropriation of Trust monies and property for his benefit on the basis that

each constituted a defalcation while acting in a fiduciary capacity. The Trust contends that the Debtor

acted in a "a fiduciary capacity" within the meaning of § 523(a)(4) both as trustee of the Trust and as the

attorney in fact under the Power of Attorney and that each of his misappropriations was a defalcation

while acting in one or the other of these capacities.  Jeffrey does not dispute that he acted in each

instance in a fiduciary capacity but contends that none of the acts in question were defalcations for the

following reasons: (i) that, in each instance, Elizabeth consented to and/or ratified the use of trust funds

for his purposes by oral expressions of consent or ratification; (ii) that, in each instance, Elizabeth

consented to and/or ratified the use of trust funds for his purposes by operation of the Power of

Attorney, which the Debtor  contends constituted a blanket advance ratification of everything he might

do as trustee; (iii) that no defalcation occurred because he had express authority as trustee to invest,

loan, and pledge trust assets as he saw fit, including by investing them in the name of another, all

without the consent of the beneficiary; (iv) that, in view of the powers granted him in the Power of

Attorney, Elizabeth's advance ratification through the Power of Attorney of everything he might do

pursuant to it, her oral expressions of approval of the uses of Trust funds at issue, and his power under

the Trust to make Trust investments in a name other than that of the Trust, he did not understand

himself to be acting outside his fiduciary duty, and therefore he lacked the scienter required to establish

a defalcation; (v) that although the Trust does require a written authorization from the Settlor for the

trustee to exercise the discretion granted to him make distributions to persons other than Elizabeth, it

does not require a written authorization for every individual transaction in which the trustee exercises

such discretion; and (vi) that by making Jeffrey both her attorney in fact and the trustee of her trust,

Elizabeth "placed him into a position that invited a conflict of interest," and therefore the duty of

undivided loyalty does not apply, and a defalcation or breach of duty should instead be determined

under the good faith standard articulated in the Power of Attorney, which would require a showing of

intentional wrongdoing or gross negligence, both of which Jeffrey further contends are not present

here.

### 1.    Fiduciary Capacity

In relevant part, § 523(a)(4) excepts from discharge any debt for "defalcation while acting in a

fiduciary capacity." 11 U.S.C. § 523(a)(4). It requires proof of two things: that the debtor have acted as

the fiduciary in a fiduciary relationship; and that his or her conduct in that capacity, the conduct that

gave rise to the debt or liability in question, have constituted a defalcation. *Reiss v. McQuillin (In re*

*McQuillin)*, 509 B.R. 773, 787 (Bankr. D. Mass. 2014) and cases cited; *Whittaker v. Whittaker (In re Whittaker)*, 564 B.R. 115, 139 (Bankr. D. Mass. 2017).

The definition of "fiduciary capacity" is a matter of federal law, which has consistently limited its scope to the capacity of one who holds property under either an express trust or a technical trust, but not under a trust imposed by law as a remedy, as a constructive trust, an implied trust, or a trust *ex maleficio*. *Stowe v. Bologna (In re Bologna)*, 206 B.R. 628, 632 (Bankr. D. Mass 1997), citing *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934) and *Matter of Marchiando*, 13 F.3d 1111, 1115 (7th Cir. 1994).

### A.   As to the Trust

"The usual elements of an express trust have traditionally included an explicit declaration of trust, a clearly defined trust *res*, and an intent to create a trust relationship." *Raso v. Fahey (In re Fahey)*, 482 B.R. 678, 687 (1st Cir. BAP 2012) (internal quotations and citations omitted). There is no dispute, and in any event I find, that all three elements of an express trust are present here with respect to Jeffrey as trustee of the Trust. I conclude that in his handling of the Trust's assets, the Debtor was acting "in a fiduciary capacity" within the meaning of § 523(a)(4).

### B.   As to the Power of Attorney

The Trust further contends that the Debtor also acted in a fiduciary capacity within the meaning of § 523(a)(4) when he acted as Elizabeth's attorney in fact under the Power of Attorney. The issue is a moot one because a breach or abuse by Jeffrey of his obligations (fiduciary or otherwise) under the Power of Attorney might give rise to claims *in favor of Elizabeth*, but those breaches would not give rise to liability *to the Trust;* the Trust does not contend otherwise. Nor does the Trust seek a determination of nondischargeability as to direct liabilities of Jeffrey to Elizabeth.  And only the Trust is a plaintiff in this proceeding; Elizabeth herself is not.  Accordingly, I need not determine whether Jeffrey acted in a

fiduciary capacity when he acted as Elizabeth's attorney in fact under the Power of Attorney. The

adversary proceeding concerns only Jeffrey's liability to the Trust.

### 2.   Defalcation

The Trust must further establish that the liabilities for which it seeks a determination of

nondischargeability under this prong of § 523(a)(4) arise from "defalcations" committed while acting in

his fiduciary capacity under the Trust. "Defalcation" in § 523(a)(4) requires a breach of fiduciary duty.

*Rutanen v. Baylis (In re Baylis)*, 313 F.3d 9, 17–18 (1st Cir. 2002). It clearly includes the kind of conduct of

which the Trust complains, misappropriation of money held in a fiduciary capacity. *In re Bologna*, 206

B.R. at 633 ("Black's Law Dictionary defines 'defalcation' as '[t]he ... act of embezzling; ...

misappropriation of trust funds or money held in any fiduciary capacity; failure to properly account for

such funds"); *In re Whittaker*, 564 B.R. at 141. In *Baylis*, the First Circuit explained that "a defalcation

may be presumed from a breach of the duty of loyalty, the duty not to act in the fiduciary's own interest

when that interest comes or may come into conflict with the beneficiaries' interest." *In re Baylis*, 313

F.3d at 20.

Notwithstanding defalcation's broad dictionary meaning, not every default, however innocent,

will suffice. A defalcation must involve either (i) moral turpitude, bad faith, or other immoral conduct, or

(ii) in lieu of these, an intentional wrong, which includes not only conduct that the fiduciary knows is

improper but also reckless conduct of the kind that the criminal law often treats as the equivalent, such

as where the fiduciary consciously disregards, or is willfully blind to, a substantial and unjustifiable risk

that his conduct will turn out to violate a fiduciary duty. *Bullock v. BankChampaign, N.A.*, 569 U.S. 267,

273-74, 133 S.Ct. 1754, 1759-60, 185 L.Ed.2d 922 (2013). That risk "must be of such a nature and degree

that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its

disregard involves a gross deviation from the standard of conduct that a law-abiding person would

observe in the actor's situation." *Id*. at 1760. In all of these possible ways that *Bullard* may be satisfied—

47

conduct involving "moral turpitude" or "bad faith," "other immoral conduct," an "intentional wrong"

involving conduct "that the fiduciary knows is improper," and conscious disregard or willful blindness to

a substantial and unjustifiable risk that the conduct will turn out to violate a fiduciary duty—there is a

requirement of scienter in the sense of appreciation by the fiduciary of the wrongfulness or his or her

conduct, "a culpable state of mind."  The Supreme Court was clear on the point: "We hold that

[defalcation] includes a culpable state of mind requirement akin to that which accompanies application

of the other terms in the same statutory phrase. We describe that state of mind as one involving

knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary

behavior." *Id*. at 1757. The necessary state of mind, rarely provable by direct evidence, may be

determined from the totality of the circumstances, including inferences from circumstantial facts.

*Palmacci v. Umpierrez*, 121 F.3d 781, 790 (1st Cir.1997), citing *Desmond v. Varrasso (In re Varrasso)*, 37

F.3d 760, 764 (1st Cir. 1994) ("circumstantial evidence may be sufficiently potent to establish fraudulent

intent beyond hope of contradiction"); *Putnam Resources v. Pateman*, 958 F.2d 448, 459 (1st Cir.1992)

("It is black letter law that fraud may be established by inference from circumstantial facts.").

In sum, as to each alleged defalcation, the Trust must establish (i) that it constituted a breach of

Jeffrey's fiduciary duty under the Trust and (ii) that the breach involved a degree of fault that satisfies

*Bullock*. I will address each incident in turn but first will address those issues of law that apply generally

to all, each bearing on the question of whether or not Jeffrey's conduct amounted to a breach of his

fiduciary duty as trustee.

### A.  Issues of General Applicability

#### i.  The Necessity of an Authorization in Writing

The gravamen of each incident of which the Trust complains is the same, that Jeffrey

appropriated Trust monies and assets for his own and his family's purposes *without Elizabeth's written*

*authorization*. The Trust contends that Elizabeth's written authorization was required by the Trust itself

for distributions to or for the benefit of any person other than Elizabeth, and Jeffrey does not contend

otherwise (though he disputes the applicability of the requirement to some of the incidents of which the

Trust complains). The Court agrees. The Trust expressly required Elizabeth's written authorization as a

condition of distributions to or for the benefit of any person other than Elizabeth: "Notwithstanding the

provision of the preceding subparagraphs B and C, the Trustee shall not, during the Settlor's lifetime,

make any distributions of income or principal to or for the benefit of any person other than the Settlor

unless the Settlor shall have authorized the same by written authorization filed with the Trustee." Trust,

Art. I, ¶ D. To be clear: this paragraph required not only that Elizabeth authorize the distribution, but

also that the authorization be *in writing*.

Jeffrey, as trustee, was obligated to keep on file any written authorization of this nature that he

received, so that he could readily account to the other beneficiaries— Elizabeth during her lifetime, and

Matt thereafter (provided her will did not direct an alternative disposition of the residue)—for

dispositions of Trust assets.  At least during Jeffrey's tenure as trustee, this obligation carried heightened

importance for several reasons.  First, Elizabeth was known to have memory issues and, during periods

of substance abuse, was known to her children to lie; Jeffrey, as trustee, might need the writings to be

able to prove Elizabeth's authorizations to Elizabeth herself and to defend himself against

misrepresentations by Elizabeth concerning her past authorizations.  Second, Jeffrey himself, one of two

contingent beneficiaries, testified that his policy was to keep Matt, the other contingent beneficiary, in

the dark about the Trust[10] and his disposition of its assets; Jeffrey, as trustee, might one day, after

Elizabeth's death, need Elizabeth's written authorizations to account to Matt.  Third, having the

authorizations in writing would go a long way toward averting litigation, consequent legal expenses to

the Trust, and, more basically, family discord over distributions for which there was no written approval.

---

[10] This was motivated not by animus against Matt but by concern to prevent information about the Trust from reaching Matt's father, but the result was still to keep Matt in the dark.

This was especially important in a family that had suffered discord, litigation, and legal expenses as a result of Leo's having disinherited Elizabeth of the bulk of his fortune.

I conclude that it would constitute a breach of the trustee's obligation and fiduciary duty under the Trust for the trustee to (i) make a distribution of principal or interest to someone other than Elizabeth that she had not authorized at all or (ii) to make such a distribution that Elizabeth had authorized orally (or by other non-written indication) but not in writing.

Jeffrey argues that, although Article I.D of the Trust requires a written authorization from Elizabeth for the trustee to exercise the discretion given him to make distributions to persons other than Elizabeth, it does not require a written authorization for every individual transaction in which he exercises that discretion.  I reject this argument. Article I.D does not require a separate writing for each transaction; one writing could authorize multiple disbursements. Nonetheless, each disbursement must be authorized in writing.[11]  And the authorization may not take the form of a blank check; this would amount to Elizabeth's altering the terms of the Agreement of Trust by effectively eliminating the requirement of an authorization for each covered transfer; Elizabeth is not free to alter the terms of the Agreement of Trust.

### ii.   The Power of Attorney as Written Authorization

Jeffrey contends that he made the distributions of which the Trust now complains with the benefit of the written authorization contained in the Durable Power of Attorney, which Elizabeth executed before Jeffrey became trustee and therefore, Jeffrey contends, supplied written authorization for, and ratification of, every distribution now at issue.  Jeffrey here relies on the following language in paragraph 2 of the Power of Attorney:  "hereby ratifying and confirming all that my Attorney-in-Fact shall lawfully do or cause to be done by virtue hereof."  This phrase fits at best awkwardly in the long

---

[11] Jeff does not elaborate on this argument or indicate the facts to which it pertains.  Aside from the Power of Attorney, which I deal with below, he identifies no writing that he contends authorizes multiple disbursements.

sentence from which it is taken,[12] so that it is unclear what "hereby" refers to.  For purposes of

argument, I will assume this phrase means what Jeffrey says it means: that, by use of this language,

Elizabeth "ratif[ied] and confirm[ed] all that [Jeffrey] shall lawfully do or cause to be done by virtue

hereof, including managing my financial affairs to the same extent as I might do myself."  Jeffrey argues

without elaboration that by virtue of this language, Elizabeth supplied the written authorization

required by the Trust Article 1.D for distributions to persons other than Elizabeth.

This argument is a nonstarter.  At best, the cited language approves all that Jeffrey shall do or

cause to be done "by virtue hereof."  "Hereof" in this phrase is a reference to the authority that was

conferred by the Power of Attorney, and especially by the paragraph and sentence of that document in

which this word appears.  But the acts in issue are acts of Jeffrey as trustee of the Trust.  This language

does not purport to approve anything Jeffrey might do as trustee of the Trust.[13]

> ### iii.   The Power of Attorney as Authorization to Supply Authorization under
> ### Trust Article 1.D for Elizabeth in her Stead

Nor is it the case that by virtue of the power of attorney, Jeffrey was able to supply, either

expressly or implicitly, Elizabeth's authorization for the disbursements in her stead.  Jeffrey does not

make this argument, but it is important to be clear on this point, because it forms a significant part of

legal framework in which Jeffrey exercised his various fiduciary obligations.

Colorado law controls the construction of the Power of Attorney.[14]  From the date in 1996 on

which the Power of Attorney was executed until January 1, 2010, Colorado law governing powers of

---

[12]  "Powers of Attorney-in-Fact:  My attorney-in-fact shall have full power and authority to do and perform all and
every act and thing whatsoever requisite and necessary to be done in and about the premises, as fully to all intents
and purposes as I might or could do if personally present, with full power of substitution and revocation, hereby
ratifying and confirming all that my Attorney-in-Fact shall lawfully do or cause to be done by virtue hereof,
including managing my financial affairs to the same extent as I might do myself, including without limitation all
powers conferred on fiduciaries by law[.]"
[13]  Jeffrey was not yet trustee when the Power of Attorney was executed.  Nor is there evidence that the Power of
Attorney was executed in contemplation that Jeffrey might later become the trustee.
[14]  The Trust cites to Colorado law without discussion of the choice-of-law issue; the Debtor does not address this
issue.  I am satisfied that Colorado law controls, principally because Liz expressly so elected in the Power of
Attorney, but also because she executed it in Colorado, she resided in Colorado when she executed it (and, to the

attorney provided that "an agent may not require the trustee of any trust for the benefit of the principal

to pay income or principal to the agent without specific authority and specific reference to the trust in

the agency instrument."  Colo. Rev. Stat. § 15-14-608, added by Colo. Sess. Laws 1994, H.B. 94-1228, § 1,

eff. Jan. 1, 1995; repealed by Colo. Sess. Laws 2009, Ch. 106, § 15, eff. Jan. 1, 2010.  The Power of

Attorney did not contain the specific authority and specific authorization that this statute required; it

made no reference to the Trust at all.  Therefore, from the 1996 execution of the Power of Attorney

through December 31, 2009, Jeffrey could not, within the bounds of his authorization under the Power

of Attorney and Colorado law, supply in Elizabeth's stead the authorization required by Article I.D of the

Trust.

Effective January 1, 2010, Colorado repealed § 15-14-208 and adopted the Uniform Power of

Attorney Act, codified at Colo. Rev. Stat. § 15-14-701 *et seq*. ("the UPAA"). The UPAA applies to a power

of attorney created before January 1, 2010 but does not affect an act done before that date.  Colo. Rev.

Stat. § 15-14-745(1)(a) and (d) ("Except as otherwise provided in this part 7, on January 1, 2010: (a) This

part 7 applies to a power of attorney created before, on, or after January 1, 2010; [. . .] and (d) An act

done before January 1, 2010, is not affected by this part 7.").  It therefore governed the Power of

Attorney from and after January 1, 2010 but does not alter the propriety (or not) of an act undertaken

by Jeffrey before that date.

In relevant part, the UPAA states:

> (1) An agent under a power of attorney may do the following on behalf of
> the principal or with the principal's property only if the power of
> attorney expressly grants the agent the authority and exercise of the
> authority is not otherwise prohibited by another agreement or
> instrument to which the authority or property is subject:  . . .
>
> (b) Make a gift; [or]
>
> (g) Exercise: . . .

---

extent that it may matter, at all relevant times since then), and no other state appears to have a greater (or any)
interest in the matter.

> (III) A power to direct a fiduciary in the exercise of a power of the
> fiduciary with respect to property subject to the fiduciary
> relationship, including, but not limited to, a power to direct
> investments, or to consent, veto, or otherwise participate in
> controlling the exercise of such a power.

Colo. Rev. Stat. § 15-14-724(1).  The Power of Attorney that Elizabeth executed did not expressly

grant the agent the authority to make a gift, much less to himself or from the Trust.  Nor did it

specifically authorize the agent to exercise Elizabeth's power under the Trust to authorize the trustee in

the exercise of its powers to make distributions to persons other than Elizabeth.  Therefore, from and

after January 1, 2010, too, Jeffrey could not, within the bounds of his authorization under the Power of

Attorney and Colorado law, supply in Elizabeth's stead the authorization required by Article I.D of the

Trust.

### iv.   Consent or Ratification under 20 Pa. Con. Stat. § 7789

In reliance on 20 Pa. Con. Stat. § 7789, Jeffrey argues that the distributions of which the Trust

complains were not breaches of his fiduciary duty because, in each instance, Elizabeth consented to or

ratified the use of trust funds for his purposes in two separately effective ways: (i) through the language

of the Power of Attorney and (ii) through oral expressions of consent.  The Trust responds that (i)

Elizabeth did not consent to or ratify the distributions at issue, (ii) under Pennsylvania law, 20 Pa. Cons.

Stats. § 7705(a), the provisions of the Trust, including its requirement of a writing, prevail over the

provisions of § 7789, and (iii) that, if § 7789 does apply, it requires an affirmative act by the beneficiary,

not mere knowledge and failure to object.

Section 7789 provides:  "A trustee is not liable to a beneficiary for breach of trust if the

beneficiary consented to the conduct constituting the breach, released the trustee from liability for the

breach or ratified the transaction constituting the breach, unless the consent, release or ratification of

the beneficiary was induced by improper conduct of the trustee."  20 Pa. Con. Stat. § 7789.  Section

7789 is part of the Uniform Trust Code (UTC) as adopted by the Commonwealth of Pennsylvania in 2006

(effective Nov. 6, 2006).  Contrary to what Jeffrey suggests, it does not state that a beneficiary's consent

or ratification transforms a breach of fiduciary duty into a non-breach; by its own words, it applies

precisely where there was "conduct constituting [a] breach" or a "transaction constituting [a] breach."

Rather, it protects a trustee from liability for a breach. Where it applies, it amounts to an affirmative

defense to liability to a beneficiary for a breach of fiduciary duty, the burden being on the trustee to

prove the beneficiary's consent, not on the beneficiary to prove non-consent as an element of her proof

of breach.  Also, "[t]his section requires an affirmative act by the beneficiary. A failure to object is not

sufficient."  Unif. Trust Code § 1009 cmt. (2000), citing Restatement (Second) of Trusts § 216 cmt. a

(1959).  Finally, 20 Pa. Cons. Stats. § 7705(a) makes clear that § 7789 is a default rule and does not

prevail over contrary provisions of a trust instrument.  "Except as provided in subsection (b), the

provisions of a trust instrument prevail over any contrary provisions of this chapter." 20 Pa. Cons. Stats.

§ 7705(a).  The provisions of § 7789 are not among the exceptions enumerated in subsection (b).  20 Pa.

Cons. Stats. § 7705(b).  The UTC comment on UTC § 105, on which Pennsylvania's § 7705(a) is based,

explains:

> Subsection (a) emphasizes that the Uniform Trust Code is primarily a default
> statute. While this Code provides numerous procedural rules on which a
> settlor may wish to rely, the settlor is generally free to override these rules
> and to prescribe the conditions under which the trust is to be administered.
> With only limited exceptions, the duties and powers of a trustee, relations
> among trustees, and the rights and interests of a beneficiary are as specified
> in the terms of the trust.

Unif. Trust Code § 105 cmt. (2000).[15] It follows then that the requirement in Article I.D of the Trust of

Elizabeth's prior authorization in writing as a condition of the trustee's making distributions to persons

other than Elizabeth is not displaced or overridden by § 7789. And proof of her non-written consent,

---

[15] UTC § 105(a) and 20 Pa. Cons. Stats. § 7705(a) are not identical in wording but are of the same import. UTC §
105(a) states:  "Except as otherwise provided in the terms of the trust, this [Code] governs the duties and powers
of a trustee, relations among trustees, and the rights and interests of a beneficiary."

before or after the fact, to an act for which the Trust requires prior written consent, would constitute no

defense under § 7789.

This leaves only Jeffrey's contention that the Power of Attorney supplied prior *written* consent

or ratification within the meaning of this statute. For reasons already articulated, it plainly did not.

Section 7789 is concerned with consent to or ratification of breaches of the trust, but the language of

the Power of Attorney—by which Liz "ratif[ies] and confirm[s] all that [Jeff] shall lawfully do or cause to

be done by virtue hereof," meaning by virtue of the Power of Attorney—purports to ratify and confirm

only what Jeffrey does or causes to be done by exercise of the power of attorney.  It does not ratify or

confirm actions he takes as trustee of the Trust.  Moreover, the language in question authorized only

acts that Jeffrey shall "lawfully" do or cause to be done. For reasons set forth above, Jeffrey's exercise of

the power of attorney to supply the authorization required by Article I.D of the Trust would be an

unlawful use of his power of attorney under Colorado law.

For all these reasons, I conclude that Jeffrey's reliance on § 7789 is wholly without merit.

### v.   Power to Invest

Jeffrey argues that under the Trust, he was authorized to invest Trust assets without the consent

of the beneficiary.  The Trust does not dispute this proposition, and I conclude that, under Article III of

the Trust, Jeffrey as trustee was authorized to invest Trust assets without the consent of the beneficiary.

Jeffrey further argues that under the Trust, he was authorized to hold and invest Trust property

in a name other than that of the Trust.  The Trust does not dispute this proposition, and I conclude that

Jeffrey as trustee was authorized to hold and invest Trust property in a name other than that of the

Trust.  Specifically, Article III authorized the trustee "to hold property in the individual name of the

fiduciary or in the name of a nominee or nominees, without disclosure of the trust[.]"  It does not follow,

however, that in each instance in which Jeffrey invested or held Trust monies or other assets in a name

other than the Trust, he was necessarily holding the asset in question as the Trust's and had not effected

a conveyance of the Trust assets, or their value, to the party in whose name he had invested or placed them. In each instance, this is a question of fact.

### vi.    Conflict of Interest and Resulting Standard

Jeffrey argues, with respect to each instance of defalcation alleged against him, that by making him both her attorney in fact and the trustee of her trust, Elizabeth "placed him into a position that invited a conflict of interest," and therefore the duty of undivided loyalty, applicable to the trustee of a trust, should not apply, and a defalcation or breach of duty should instead be determined under the good faith standard articulated in the Power of Attorney, which would require a showing of intentional wrongdoing or gross negligence, both of which Jeffrey contends are not present here.  Even if valid, this argument would make no difference because I have found that, in each instance, Jeffrey knew of the requirement of Elizabeth's authorization in writing and nonetheless intentionally made the appropriations at issue, knowing them to be in breach of his fiduciary duties as trustee for lack Elizabeth's authorization in writing and indeed in any form.  Even if the standard were intentional wrongdoing or gross negligence, it would be satisfied here.  For what it may matter, however, I also reject the contention that Jeffrey's duties as trustee on the one hand and as attorney in fact on the other "invited a conflict of interest"—Jeffrey does not elaborate on what he means by this, I am aware of no obvious conflict, and I have found that Jeffrey labored under no misunderstanding of his responsibilities—or justifies a lessening of the standard to which he as trustee should be held.

### B.    The Alleged Defalcations

### i.    Nanny's Salary

Jeffrey's appropriations of Trust monies to pay the salary of his children's nanny were acts he committed as trustee of the Trust and, as such, in a fiduciary capacity.  They were also defalcations within the meaning of § 523(a)(4) because, being for the benefit of himself and his family, they required Elizabeth's written authorization but were made without her authorization, in writing or otherwise, and

because Jeffrey made them with knowledge that he did not have the necessary authorization to make them and thus with knowledge that they were wrongful.  Jeffrey's liability to the Trust for these appropriations, including any interest, attorney's fees, and consequential or punitive damages that may be awarded on account of them, is excepted from discharge under § 523(a)(4) as a debt for defalcation while acting in a fiduciary capacity.

### ii.   Purchases in Oak Creek

Jeffrey's appropriations of Trust monies to fund the acquisition and development of properties in Oak Creek, Colorado, for the three Oak Creek LLCs he formed with David Epstein were acts he committed as trustee of the Trust and, as such, in a fiduciary capacity.  They were also defalcations within the meaning of § 523(a)(4) because, being for the benefit of himself and David Epstein, they required Elizabeth's written authorization but were made without her authorization, in writing or otherwise, and because Jeffrey made them with knowledge that he did not have the necessary authorization to make them and thus with knowledge that they were wrongful.  Jeffrey's use of Trust money for this purpose was not an investment by the Trust; all equity in the LLCs belonged to himself and Epstein, and neither held his equity for the Trust.  Nor were his uses of Trust money for this purpose a loan.  Jeffrey's liability to the Trust for these appropriations, including any interest, attorney's fees, and consequential or punitive damages that may be awarded on account of them, is excepted from discharge under § 523(a)(4) as a debt for defalcation while acting in a fiduciary capacity.

### iii.   Pavilion Ranch

The Trust has withdrawn its request for a determination that any liability of Jeffrey to the Trust for its uses of Trust money on the Pavilion Ranch development, including to purchase equity interests in the LLC for Matt and Jeffrey, is excepted from discharge.  Accordingly, no ruling of law on this count is required.

### iv.   Franchise Business

Jeffrey's appropriations of Trust monies to fund his equity investments in Chair 5 Partners were acts he committed as trustee of the Trust and, as such, in a fiduciary capacity.  They were also defalcations within the meaning of § 523(a)(4) because, being for the benefit of himself, they required Elizabeth's written authorization but were made without her authorization, in writing or otherwise, and because Jeffrey made them with knowledge that he did not have the necessary authorization to make them, in writing or otherwise, and thus with knowledge that they were wrongful.  Jeffrey's use of Trust money for this purpose was not an investment by the Trust; all the acquired equity in Chair 5 Partners that these appropriations funded belonged to himself, and he did not hold this equity for the Trust.  Nor was it a loan to Chair 5 Partners, Jeffrey, or any entity.  Jeffrey's liability to the Trust for these appropriations, including any interest, attorney's fees, and consequential or punitive damages that may be awarded on account of them, is excepted from discharge under § 523(a)(4) as a debt for defalcation while acting in a fiduciary capacity.

To be clear, the liability hereby excluded from discharge does not include liability for expenses the Trust incurred to fund the issuance of letters of credit to secure leases for the benefit of Chair 5 Partners or subsidiary entities.  These letters of credit were authorized in writing by Elizabeth.

### v.   Private School Tuition

Jeffrey's appropriations of Trust monies to pay for the private school tuition of his children were acts he committed as trustee of the Trust and, as such, in a fiduciary capacity.  They were also defalcations within the meaning of § 523(a)(4) because, being for the benefit of himself and his family, they required Elizabeth's written authorization but were made without her authorization, in writing or otherwise, and because Jeffrey made them with knowledge that he did not have the necessary authorization to make them, and thus with knowledge that they were wrongful.  Jeffrey's liability to the Trust for these appropriations, including any interest, attorney's fees, and consequential or punitive

damages that may be awarded on account of them, is excepted from discharge under § 523(a)(4) as a debt for defalcation while acting in a fiduciary capacity.

### vi.   Purchase and Development of 121 Livingston Road

Jeffrey's appropriations of Trust monies to fund the purchase and development of 121 Livingston Road were acts he committed as trustee of the Trust and, as such, in a fiduciary capacity. They were also defalcations within the meaning of § 523(a)(4) because, being for the benefit of himself and his family, they required Elizabeth's written authorization but were made without her authorization, in writing or otherwise, and because Jeffrey made them with knowledge that he did not have the necessary authorization to make them, in writing or otherwise, and thus with knowledge that they were wrongful.  Jeffrey's use of Trust money for this purpose was not an investment by the Trust; all the equity in 121 Livingston Road always belonged to himself and Abigail, either directly or, at first, through PAP LLC; and neither he and Abigail nor PAP LLC ever held its equity for the Trust.  Nor were these appropriations in the nature of loans.  They were distributions with no strings attached.  Jeffrey's liability to the Trust for these appropriations, including any interest, attorney's fees, and consequential or punitive damages that may be awarded on account of them, is excepted from discharge under § 523(a)(4) as a debt for defalcation while acting in a fiduciary capacity.

### vii.   Subordination of Mortgage on 121 Livingston Road

Jeffrey's subordination of the Trust Mortgage was, in fact and in effect, a distribution of equity in 121 Livingston Road that belonged to the Trust to Jeffrey, which equity Jeffrey appropriated to satisfy a personal obligation to a third party. Jeffrey subordinated the Trust Mortgage in his capacity as trustee of the Trust and, as such, in a fiduciary capacity.  Jeffrey's subordination of the Trust Mortgage was a defalcation within the meaning of § 523(a)(4) because, being for the benefit of himself, it required Elizabeth's written authorization but was made without her authorization, in writing or otherwise, and because Jeffrey subordinated the Trust Mortgage with knowledge that he did not have the necessary

authorization, in writing or otherwise, and thus with knowledge that it was wrongful.  Jeffrey's liability

to the Trust for the subordination, including any interest, attorney's fees, and consequential or punitive

damages that may be awarded on account of it, is excepted from discharge under § 523(a)(4) as a debt

for defalcation while acting in a fiduciary capacity.

### viii.   The Vail Condo

Jeffrey's appropriations of Trust monies to fund the acquisition of the Vail Condo for LG Capital

and to fund Jeffrey's and Matt's equity contributions to LG Capital were acts he committed as trustee of

the Trust and, as such, in a fiduciary capacity.  They were also defalcations within the meaning of §

523(a)(4) because, being for the benefit of himself and Matt, they required Elizabeth's written

authorization but were made without her authorization, in writing or otherwise, and because Jeffrey

made them with knowledge that he did not have the necessary authorization to make them and thus

with knowledge that they were wrongful.  Jeffrey's use of Trust money for this purpose was not an

investment by the Trust; all equity in the LLC belonged to himself and Matt, and neither held his equity

for the Trust.  Nor were his uses of Trust money for these purposes a loan.  Jeffrey's liability to the Trust

for these appropriations, including any interest, attorney's fees, and consequential or punitive damages

that may be awarded on account of them, is excepted from discharge under § 523(a)(4) as a debt for

defalcation while acting in a fiduciary capacity.

### ix.   The Jamaica Birthday

Jeffrey's appropriations of Trust monies to pay for his Jamaican birthday expedition/celebration

were acts he committed as trustee of the Trust and, as such, in a fiduciary capacity.  They were also

defalcations within the meaning of § 523(a)(4) because, being for the benefit of himself and his family,

they required Elizabeth's written authorization but were made without her authorization, in writing or

otherwise, and because Jeffrey made them with knowledge that he did not have the necessary

authorization to make them, and thus with knowledge that they were wrongful.  Jeffrey's liability to the

Trust for these appropriations, including any interest, attorney's fees, and consequential or punitive

damages that may be awarded on account of them, is excepted from discharge under § 523(a)(4) as a

debt for defalcation while acting in a fiduciary capacity.

### x.   Payment of American Express Charges

The complaint seeks a determination that Jeffrey's liability for alleged use of Trust monies to

fund payment of charges by Abigail to her own American Express credit card account is excepted from

discharge.  The record is virtually devoid of evidence in support of this alleged use of Trust money.  The

Trust has failed establish that Jeffrey's alleged uses of Trust monies to fund his family's American

Express charges were defalcations while acting in a fiduciary capacity.

### xi.   Acquisition of Interest in Sportvision

In its complaint, the Trust seeks a determination that Jeffrey's self-appropriations from the Trust

included use of Trust assets to purchase shares in a corporation identified as Sportvision, Inc., and that

he transferred these shares to Abigail to put them beyond the reach of existing creditors.  The record

includes no evidence about Jeffrey's acquisition of shares in Sportvision, Inc. or transfer of any such

shares to Abigail.  The Trust has accordingly failed to carry its burden of proof that this particular use of

Trust assets was a defalcation while acting in a fiduciary capacity.

### d.   Embezzlement

The Trust argues that Jeffrey's self-appropriations of Trust assets are also excepted from

discharge as embezzlement within the meaning of § 523(a)(4).  Subsection (a)(4) excepts from discharge

"any debt . . .  for . . . embezzlement."  11 U.S.C. § 523(a)(4).  Embezzlement in § 523(a)(4) "is the

fraudulent conversion of the property of another by one who is already in lawful possession of it."  *In re*

*Sherman*, 603 F.3d 11, 13 (1st Cir. 2010).  "[T]o amount to embezzlement, conversion must be

committed by a perpetrator with fraudulent intent."  *Id*.  "It is knowledge that the use is devoid of

authorization, scienter for short . . . that makes the conversion fraudulent and thus embezzlement." *Id*.

In summary, embezzlement requires proof that "(i) property in the perpetrator's lawful possession but (ii) belonging to another (iii) was appropriated by the perpetrator in a manner inconsistent with the property rights of the other and the scope of his or her authorization to deal with the property (iv) with fraudulent intent." *Reiss v. McQuillin*, 509 B.R. 773, 785 (Bankr. D. Mass 2014) (citing *Sherman*, 603 F.3d at 13).  Embezzlement does not require proof that the perpetrator held the property as a fiduciary.  *In re Romano*, 353 B.R. 738, 765 (Bankr. D. Mass. 2006), citing *Chapman v. Pomainville*, 254 B.R. 699, 704 (Bankr. S.D. Ohio 2000).

In each instance at issue, the property at issue belonged to another because, although Jeffrey, as trustee, had legal title to the property, he did not own the beneficial interest in that property; and by the acts complained of, Jeffrey appropriated the beneficial interest to his own use.  I conclude that, to the extent of the beneficial interest, the property in question belonged to another for purposes of the embezzlement prong of § 523(a)(4).

### 1. Nanny's Salary

Jeffrey's appropriations of Trust monies to pay the salary of his children's nanny were appropriations of property in his lawful possession as trustee but belonging to another to the extent of the beneficial interest in the monies, which belonged to Elizabeth.  Each such appropriation was inconsistent with the Elizabeth's beneficial interest in the monies and, for the same reasons as I determined that they were defalcations, beyond the scope of his authorization to deal with the property. And each such appropriation was committed with knowledge of its wrongfulness and therefore with fraudulent intent. Jeffrey's liability to the Trust for these appropriations, including any interest, attorney's fees, and consequential or punitive damages that may be awarded on account of them, is excepted from discharge under § 523(a)(4) as a debt for embezzlement.

### 2.   Purchases in Oak Creek

Jeffrey's appropriations of Trust monies to fund the acquisition and development of properties in Oak Creek, Colorado, for the three Oak Creek LLCs he formed with David Epstein were appropriations of property in his lawful possession as trustee but belonging to another to the extent of the beneficial interest in the monies, which belonged to Elizabeth.  Each such appropriation was inconsistent with the Elizabeth's beneficial interest in the monies and, for the same reasons as I determined that they were defalcations, beyond the scope of his authorization to deal with the property. And each such appropriation was committed with knowledge of its wrongfulness and therefore with fraudulent intent. Jeffrey's use of Trust money for this purpose was not an investment by the Trust; all equity in the LLCs belonged to himself and Epstein, and neither held his equity for the Trust.  Nor were his uses of Trust money for this purpose a loan. Jeffrey's liability to the Trust for these appropriations, including any interest, attorney's fees, and consequential or punitive damages that may be awarded on account of them, is excepted from discharge under § 523(a)(4) as a debt for embezzlement.

### 3.   Pavilion Ranch

The Trust having withdrawn its request for a determination that any liability of Jeffrey to the Trust for its uses of Trust money on the Pavilion Ranch development, including to purchase equity interests in the LLC for Matt and Jeffrey, is excepted from discharge, no ruling of law on this count is required.

### 4.   Franchise Business

Jeffrey's appropriations of Trust monies to fund his equity investments in Chair 5 Partners were appropriations of property in his lawful possession as trustee but belonging to another to the extent of the beneficial interest in the monies, which belonged to Elizabeth.  Each such appropriation was inconsistent with the Elizabeth's beneficial interest in the monies and, for the same reasons as I determined that they were defalcations, beyond the scope of his authorization to deal with the

property. And each such appropriation was committed with knowledge of its wrongfulness and therefore with fraudulent intent.  Jeffrey's use of Trust money for this purpose was not an investment by the Trust; all the acquired equity in Chair 5 Partners that these appropriations funded belonged to himself, and he did not hold this equity for the Trust.  Nor was it a loan, to Chair 5 Partners, Jeffrey, or any entity. Jeffrey's liability to the Trust for these appropriations, including any interest, attorney's fees, and consequential or punitive damages that may be awarded on account of them, is excepted from discharge under § 523(a)(4) as a debt for embezzlement.

To be clear, the liability hereby excluded from discharge does not include liability for expenses the Trust incurred to fund the issuance of letters of credit to secure leases for the benefit of Chair 5 Partners or subsidiary entities.  These letters of credit were authorized in writing by Elizabeth.

### 5.  Private School Tuition

Jeffrey's appropriations of Trust monies to pay for the private school tuition of his children were appropriations of property in his lawful possession as trustee but belonging to another to the extent of the beneficial interest in the monies, which belonged to Elizabeth.  Each such appropriation was inconsistent with the Elizabeth's beneficial interest in the monies and, for the same reasons as I determined that they were defalcations, beyond the scope of his authorization to deal with the property. And each such appropriation was committed with knowledge of its wrongfulness and therefore with fraudulent intent. Jeffrey's liability to the Trust for these appropriations, including any interest, attorney's fees, and consequential or punitive damages that may be awarded on account of them, is excepted from discharge under § 523(a)(4) as a debt for embezzlement.

### 6.  Purchase and Development of Livingston Road

Jeffrey's appropriations of Trust monies to fund the purchase and development of 121 Livingston Road were appropriations of property in his lawful possession as trustee but belonging to another to the extent of the beneficial interest in the monies, which belonged to Elizabeth.  Each such

appropriation was inconsistent with the Elizabeth's beneficial interest in the monies and, for the same

reasons as I determined that they were defalcations, beyond the scope of his authorization to deal with

the property. And each such appropriation was committed with knowledge of its wrongfulness and

therefore with fraudulent intent.  Jeffrey's use of Trust money for this purpose was not an investment

by the Trust; all the equity in 121 Livingston Road always belonged to himself and Abigail, either directly

or, at first, through PAP LLC; and he and Abigail and PAP LLC never held their equity for the Trust.  Nor

was these appropriations in the nature of loans.  They were distributions with no strings attached.

Jeffrey's liability to the Trust for these appropriations, including any interest, attorney's fees, and

consequential or punitive damages that may be awarded on account of them, is excepted from

discharge under § 523(a)(4) as a debt for embezzlement.

### 7.   Subordination of Mortgage on Livingston Road

Jeffrey's subordination of the Trust Mortgage was, in fact and in effect, a distribution of equity

in 121 Livingston Road that belonged to the Trust to Jeffrey, which equity Jeffrey appropriated to satisfy

a personal obligation to a third party. Jeffrey subordination of the Trust Mortgage was an appropriation

of property in his lawful possession as trustee but belonging to another to the extent of the beneficial

interest in the mortgage, which belonged to Elizabeth. It was inconsistent with the Elizabeth's beneficial

interest and, for the same reasons as I determined that it was a defalcation, beyond the scope of

Jeffrey's authorization to deal with the property. And it was committed with knowledge of its

wrongfulness and therefore with fraudulent intent. Jeffrey's liability to the Trust for the subordination,

including any interest, attorney's fees, and consequential or punitive damages that may be awarded on

account of it, is excepted from discharge under § 523(a)(4) as a debt for embezzlement.

### 8.   The Vail Condo

Jeffrey's appropriations of Trust monies to fund the acquisition of the Vail Condo for LG Capital

and to fund Jeffrey's and Matt's equity contributions to LG Capital were appropriations of property in his

lawful possession as trustee but belonging to another to the extent of the beneficial interest in the

monies, which belonged to Elizabeth.  Each such appropriation was inconsistent with the Elizabeth's

beneficial interest in the monies and, for the same reasons as I determined that they were defalcations,

beyond the scope of his authorization to deal with the property. And each such appropriation was

committed with knowledge of its wrongfulness and therefore with fraudulent intent.  Jeffrey's use of

Trust money for this purpose was not an investment by the Trust; all equity in LG Capital belonged to

himself and Matt, and neither held his equity for the Trust.  Nor were his uses of Trust money for these

purposes a loan.  Jeffrey's liability to the Trust for these appropriations, including any interest,

attorney's fees, and consequential or punitive damages that may be awarded on account of them, is

excepted from discharge under § 523(a)(4) as a debt for embezzlement.

### 9.   The Jamaica Birthday

Jeffrey's appropriations of Trust monies to pay for his Jamaican birthday expedition/celebration

were appropriations of property in his lawful possession as trustee but belonging to another to the

extent of the beneficial interest in the monies, which belonged to Elizabeth.  Each such appropriation

was inconsistent with the Elizabeth's beneficial interest in the monies and, for the same reasons as I

determined that they were defalcations, beyond the scope of his authorization to deal with the

property. And each such appropriation was committed with knowledge of its wrongfulness and

therefore with fraudulent intent. Jeffrey's liability to the Trust for these appropriations, including any

interest, attorney's fees, and consequential or punitive damages that may be awarded on account of

them, is excepted from discharge under § 523(a)(4) as a debt for embezzlement.

### 10.  Payment of American Express Charges

In its complaint, the complaint seeks a determination that Jeffrey's liability for alleged use of

Trust monies to fund payment of charges by Abigail to her own American Express credit card account is

excepted from discharge.  The record is virtually devoid of evidence in support of this alleged use of

Trust money.  The Trust has failed to establish that Jeffrey's alleged uses of Trust monies to fund his family's American Express charges constituted embezzlement.

### 11. Acquisition of Interest in Sportvision

In its complaint, the Trust seeks a determination that Jeffrey's self-appropriations from the Trust included use of Trust assets to purchase shares in a corporation identified as Sportvision, Inc., and that he transferred these shares to Abigail to put them beyond the reach of existing creditors.  The record includes no evidence about Jeffrey's acquisition of shares in Sportvision, Inc. or transfer of any such shares to Abigail.  The Trust has accordingly failed to carry its burden of proof that this particular use of Trust assets constituted embezzlement.

### e. Fraud While Acting in a Fiduciary Capacity

The Trust seeks a determination failures of Jeffrey to respond to Elizabeth's unspecified requests for information concerning his administration of the Trust constituted fraud while acting in a fiduciary capacity with the meaning of § 523(a)(4), for which some unspecified portion of his liability for self-appropriation should be excepted from discharge.  I will deny this count for several of the same reasons as I denied the Trust's count under § 523(a)(2)(A).

First, this count sounds in fraud, but the Trust has not plead the alleged fraud with particularity. It has not specified when Elizabeth made the requests for information on which this count is predicated or even indicated how many instances are in issue.  For each instance, it has not specified what specifically Elizabeth asked Jeffrey to disclose, how Jeffrey's non-response amounted to a misrepresentation, what precisely the representation was, and how it was false. It has not specified the particular portion of the liability at issue that each misrepresentation gave rise to. Fraud must be plead with particularity.  The defendant was entitled to go into the trial understanding what was being tried. Indeed even now the Court does not know the specific instances on which this count is based.

Second, though the gravamen of this count is fraudulent misrepresentation, a failure to respond to a request for information is, without more, not a representation but just a failure to respond. This count therefore fails to state a claim on which relief can be granted.

Third, Jeffrey's alleged failures to report did not themselves cause further acts of misappropriation. They were not, to a sufficient extent, the means by which further misappropriations were effected and therefore cannot be said to have given rise to the liability at issue. Jeffrey's liability for the misappropriations arises from the misappropriations themselves, not from any preceding failure to report.

### f.   The Statue of Limitations and Laches Defenses

With respect to the Trust's demand for an adjudication of Jeffrey's underlying liability, Jeffrey raised the affirmative defenses of laches and statute of limitations, and now both parties seek findings and rulings on these defenses. At the outset of this adversary proceeding, the Court indicated that it was abstaining under 28 U.S.C. § 1334(c)(1) from adjudicating the underlying claims for establishment of liability. As the defenses of laches and statute of limitations go to liability and not to dischargeability, they fall within the scope of the matters as to which the Court has abstained. The Court makes no rulings on them.

**CONCLUSION**

The Court will enter a separate judgment declaring that Jeffrey's liability to the Trust is excepted from discharge as determined above.

Date:  June 25, 2018

_____
Frank J. Bailey
United States Bankruptcy Judge